UNITED STATES of America, Plaintiff-Appellee,

v.

John Francis SCHWEIHS, Defendant-Appellant.

No. 76–4502.

United States Court of Appeals, Fifth Circuit.

March 20, 1978.

Joseph A. Varon, Hollywood, Fla., for defendant-appellant.

J. V. Eskenazi, U. S. Atty., Atlee W. Wampler, III, Atty.-in-Charge, S/E Regional Office, Crim. Div., OC&R Section, U. S. Dept. of Justice, Miami, Fla., Jerome M. Feit, Alan J. Sobol, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and RONEY and FAY, Circuit Judges.

RONEY, Circuit Judge:

After a jury trial defendant John Francis Schweihs was convicted under 18 U.S.C.A. § 2512(1)(b) for willful possession of an electronic device, knowing that the device, by virtue of its design, was primarily useful for the purpose of surreptitious interception of wire or oral communications.[1] He main-

---

1. (1) Except as otherwise specifically provided in this chapter, any person who willfully . . .

(b) manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce; . . .

shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C.A. § 2512(1)(b).

tains on this appeal that, as a matter of law, the device in question is not by design primarily useful for surreptitious interception such as is proscribed by the statute. We agree and reverse his conviction.

Around 11:00 p. m. on May 4, 1975, Otto Brueckner and his brother made a routine security check on their Fort Lauderdale automobile repair shop. As they approached the shop, they observed an unidentified person running across the front of the shop and down an alley alongside the building. The Brueckners parked their car with its headlights directed toward the shop and observed another person, defendant Schweihs, duck beneath the front end of a Pinto automobile, which was parked in the driveway in front of the shop. Schweihs initially ignored the Brueckners' requests to come out from under the car. The persuasive effect of two warning shots, however, convinced him otherwise, and he was taken into custody at gunpoint. The unidentified sprinter has apparently not been heard from since.

The police quickly responded to the Brueckners' call and conducted a search of the immediate vicinity. The repair shop is located adjacent to a Wells Fargo branch office. A chain link fence on the west side of the Wells Fargo compound extends beyond the repair shop. A telephone pole with an underground terminal and junction box is situated in the corner of the fence. The car under which Schweihs had concealed himself was located approximately 2 to 2½ feet away from the telephone pole and accompanying junction box.

The police officers discovered various pieces of electronic equipment lying on the ground along the east side of the Pinto. The equipment, which was located approximately 10 feet from where Schweihs had been apprehended, was subsequently identified as a homemade "operational amplifier" equipped with alligator clips, a miniature Triplett volt-ohmmeter, and a Western Electric lug wrench. The telephone company's underground terminal box was open,

and the miniature Triplett volt-ohmmeter was attached to the exposed telephone wires. Next to these objects the police discovered a travel kit and a flashlight. A search under the front-end suspension of the Pinto produced a police "scanner," which was set on the local police frequency, and a pair of gloves.

At trial the Government theorized that Schweihs and an unidentified confederate were in the process of burglarizing the Wells Fargo branch office when surprised by the Brueckners and that the seized electronic devices were being utilized by them to avoid detection. To support its theory, the Government detailed the circumstances discussed above and called two expert witnesses. Everett Siebert, service supervisor for the American District Telegraph Company (A.D.T.), testified that in his opinion the miniature Triplett volt-ohmmeter had been attached to the opened telephone junction box to determine which of the telephone wires were being utilized to transmit the silent burglar alarm from the Wells Fargo office to the A.D.T. office. He related that A.D.T. had installed three alarm devices in the Wells Fargo building. If the system detects an intruder, it transmits a signal to A.D.T. over the telephone lines, giving a coded sequence in pulses. Both regular telephone transmissions and the coded alarm signals are transmitted over the telephone lines in the underground terminal, but the voltage in the alarm circuit is substantially higher than that in the telephone circuit. He testified that since a volt-ohmmeter is used to read voltage, the would-be burglars, by connecting the miniature Triplett volt-ohmmeter to the junction box, could measure the voltage in the terminals and determine which wires would transmit the silent alarm signals.

Mr. Siebert further explained that isolating the particular wires carrying the alarm signal is a prerequisite to detecting whether the alarm itself has been triggered. Because the coded alarm impulses are inaudible, an electronic amplification device must

be attached to the isolated wires in order to detect the coded signals. Both Siebert and the other Government expert witness, Robert Mann, testified that if the operational amplifier found at the scene had been connected to the alarm circuits, listeners would have been able to hear the coded impulse as the signal was being transmitted and thus would have been able to determine whether the silent alarms had been triggered inside the Wells Fargo office.

■ Section 2512(1)(b) is narrowly drawn. It renders criminally liable "any person who willfully . . . possesses . . . any electronic . . . device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications . . . ." This statutory language reflects a careful and studied congressional decision to leave untouched the production, distribution, and possession of electronic equipment designed for regular use in varied nonsurreptitious activities, even though the equipment is capable of being used in a surreptitious manner, and yet to ban a narrow category of devices which by virtue of their design characteristics are *primarily* useful for eavesdropping and wiretapping.

■ The statute's legislative history reveals that Congress intended to ban such devices as martini olive transmitters, spike mikes, and microphones disguised as wristwatches and fountain pens, without prohibiting possession of a legitimate electronic device merely because it is small or may be used for wiretapping or eavesdropping. "To be prohibited, the device . . . [must] possess attributes that give predominance to the surreptitious character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter . . . ." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin. News, pp. 2183–2184.[2]

Thus, even though a device is constructed or purchased specifically for use in covert wiretapping or eavesdropping, as Schweihs' homemade operational amplifier may well have been, it is not proscribed by the statute if its design characteristics do not render it *primarily* useful for that purpose.

The operational amplifier involved in this case is a battery-powered, homemade device, consisting of a number of electronic components housed in a small black plastic chassis. Both Government expert witnesses testified that the device is capable of secretly intercepting wire communications and that it was being used for that purpose in connection with the telephone junction box.[3]

**2.** The statutory phrase ["primarily useful for the purpose of . . . surreptitious interception"] is intended to establish a relatively narrow category of devices whose principal use is likely to be for wiretapping or eavesdropping. A device will not escape the prohibition merely because it may have innocent uses. The crucial test is whether the design of the device renders it *primarily* useful for *surreptitious* listening. Obviously, the sort of judgment called for here in close cases would warrant the use of expert testimony. [emphasis in original]

. . . The prohibition will thus be applicable to, among others, such objectional devices as the martini olive transmitter, the spike mike, the infinity transmitter, and the microphone disguised as a wristwatch, a picture frame, cuff link, tie clip, fountain pen, stapler, or cigarette pack. . . .

At the same time, the prohibitions of section 2512 will cause no substantial interference with the production, distribution, or use of legitimate electronics equipment, whether by the electronics industry or others. Size alone is not the criterion under the section. A device does not fall under the prohibitions merely because it is small, or because it may be adapted to wiretapping or eavesdropping. . . . *To be prohibited, the device would also have to possess attributes that give predominance to the surreptitious character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter and the other devices mentioned in the preceding paragraph.* [emphasis added] S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2183–2184.

**3.** Mr. Siebert testified on direct examination as follows:

Q. Have you formed an opinion as to whether that device could be used to intercept wire communications?

[Siebert:] I believe that it could be.

&ast; &ast; &ast; &ast; &ast; &ast;

Section 2512(1)(b), however, does not prohibit the surreptitious *use* of an electronic device. If it did, Schweihs' conviction might well be affirmed. Rather, § 2512(1)(b) prohibits *possession* of certain electronic devices, and an electronic device is within the statute's proscription only if it is, due to *design* characteristics, "primarily useful" for covert listening.

The record contains no evidence that Schweihs' amplifier was "primarily useful" for covert listening. It is dissimilar to the devices cited in the legislative history as being within the statutory ban. The amplifier here, unlike martini olive transmitters and spike mikes, reveals no design characteristics which suggest surreptitious listening as its primary function. Indeed, on cross-examination both Government witnesses stated that Schweihs' device is basically an ordinary amplifier, that it can be used in conjunction with radios, phonographs, and other audio equipment, and that it is *not* primarily useful for the purpose of surreptitious interception of wire or oral communications.[4] In contrast, both

> Q. Given the totality of the circumstances, that is, the items which were found, which you discussed as Government Exhibit No. 1, if it was found as indicated in the picture, have you formed an opinion as to what the use of the item Government Exhibit No. 1 was for?
>
> [Siebert:] I would say if it were connected to the circuit and the pulses were heard, the person connecting it to the circuit would be able to determine when the alarms were tripped inside of the building.

Mr. Mann's testimony was to the same effect:

> Q. Have you formed an opinion as to whether the electronic device, Government Exhibit No. 1, is capable of secret interception of wire communications?
>
> [Mann:] Yes, sir, I have formed an opinion.
>
> Q. What is your opinion?
>
> [Mann:] That it is so capable.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Assume that the junction box was in the open condition as indicated in the picture and that the wires were hanging out, and further assume that the device which you have examined, that is, Government Exhibit No. 1, the electronic device, was located in the picture on the ground as indicated there, in close proximity to the junction box, have you formed an opinion as to what function the electronic device, Government Exhibit No. 1, could have in relationship to the junction box?
>
> [Mann:] Yes, I have.
>
> Q. What is your opinion?
>
> [Mann:] In the context of this photograph, I believe the device was being used for the interception of communications within that telephone junction box.
>
> Q. Have you formed an opinion as to whether this device could be used in connection with the junction box for any other purpose?
>
> [Mann:] I can see no other purpose.
>
> Q. Have you formed an opinion?
>
> [Mann:] I have formed an opinion.
>
> Q. What is your opinion?
>
> [Mann:] I know of no other purpose.

4. With regard to Schweihs' device, Government Exhibit No. 1, Mr. Siebert testified as follows:

> Q. . . . Now, what is that, primarily?
>
> [Siebert:] A small amplifier.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Now, what is the primary function of Government Exhibit No. 1?
>
> [Siebert:] To amplify a signal.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Now, coming back to Government's Exhibit No. 1 and also Defendant's Exhibit No. 2 for identification, is it true that that being a simple amplifier could have many amplifications?
>
> [Siebert:] You mean other than listening to an alarm signal?
>
> Q. Yes, sir.
>
> [Siebert:] True.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Isn't it true that this amplifying device could have many amplifications?
>
> [Siebert:] That's true.
>
> Q. Far too many to make bugging its primary function as we call it?
>
> [Siebert:] That's true.

Expert witness Mann testified as follows:

> Q. What do you call [Government Exhibit No. 1]? What name does it have?
>
> [Mann:] It is commonly called a "op-amp."
>
> Q. It's an amplifier, isn't it?
>
> [Mann:] Yes, sir.
>
> Q. Now, I want you to tell this jury what is the primary useful purpose of an amplifier?
>
> [Mann:] To boost sounds, to raise sounds.
>
> Q. That's the primary purpose, isn't it?
>
> [Mann:] Yes, sir.
>
> Q. Now, this amplifier can have other purposes too, can't it?
>
> [Mann:] Yes, sir.
>
> Q. When used in context with other things, it can be used for a multitude of matters?
>
> [Mann:] Well, I have to limit my reply. It's an amplifier and its primary purpose is as an amplifier.
>
>     \*    \*    \*    \*    \*    \*

witnesses' direct testimony focused on the use being made of the amplifier in connection with the telephone junction box and did not deal with its primary usefulness based on design.[5]

In an effort to show that his homemade device was not primarily useful for surreptitious listening, Schweihs introduced into evidence a readily available 200 milliwatt audio amplifier purchased from a local Radio Shack store, admittedly useful for amplifying radios, televisions, phonographs, and other audio equipment. The two amplifiers, according to Schweihs, are identical.

■ The Government asserts that incorporated into the circuitry of Schweihs' amplifier is a design feature, an input capacitor, not found in the Radio Shack amplifier. The input capacitor, according to the Government, enables the device to invade a line conducting electrical current without significantly draining voltage and, thus, without detection. Expert Government witness Siebert testified that the Radio Shack model lacks an input capacitor and therefore could be detected if used to intercept the silent impulses transmitted by the Wells Fargo alarm system. The difference, the Government argues, makes the Schweihs device prohibited, but not the one from Radio Shack. There is no evidence in the record, however, that every amplifier with an input capacitor is primarily useful for surreptitious activity.

Q. All right. Okay, but what we are interested in is something that is primarily useful [for the purpose of surreptitious interception], aren't we?
[Mann:] Yes, sir.
Q. And the amplifier here is not primarily useful?
[Mann:] By itself you are right, sir.
  *   *   *   *   *   *
Q. Did you discuss some of these technical aspects of this case with Mr. Siebert [the other Government expert]?
[Mann:] Yes, sir.
Q. Did Mr. Siebert tell you that this item was not primarily useful for wire interception? Did he tell you that?
[Mann:] I don't recall that specific language or intent.

Capacitors are fundamental electric circuit components basically consisting of two conducting surfaces separated by an insulating material, or dielectric, such as air, paper, mica, glass, plastic film, or oil. Through its ability to store electrical energy, the capacitor holds the current drawn from the supply substantially constant and thereby keeps the voltage output of the supply substantially constant. A capacitor in the path of a circuit will offer practically infinite opposition to the passage of direct current, but will offer little opposition to the passage of alternating current. Blocking direct components of current, which carry no audio information, is a primary function of input capacitors in amplification devices, and is not at all uncommon in general use amplifiers. Thus, the presence of the input capacitor in Schweihs' amplifier, even when contrasted with the absence of an input capacitor from the Radio Shack device, does not prove that the design of one but not the other is proscribed by the statute. To accept the Government's premise that Schweihs' amplifier is within the grasp of § 2512(1)(b) because it contains an input capacitor would make illegal the possession of many readily available amplifiers which are designed primarily for purposes having no connection to surreptitious use. Accordingly, we hold that as a matter of law, the simple presence of an input capacitor in the circuit design of the operational amplifier here in question does not bring it within the embrace of § 2512(a)(b).[6]

Q. If he said that to the jury before you got on the stand, would you differ with him?
[Mann:] Not primarily, but by itself, I would agree with him.
  *   *   *   *   *   *
Q. Can this amplifier be used to increase volume for anything?
[Mann:] Yes, sir.
Q. Volume for what?
[Mann:] I missed that.
Q. Volume for hi-fi or for a phonograph or radio?
[Mann:] Yes, sir.

5. See testimony set out in note 3, *supra*.

6. The evidence relied upon by the Government to establish that the Radio Shack amplifier lacks an input capacitor is far from convincing.

The device in this case was also equipped with alligator clips. This design feature does not render Schweihs' amplifier primarily useful for surreptitious listening. The Government does not contend that the mere addition of alligator clips would make unlawful that which by itself is lawful.

In sum, the operational amplifier involved in this case could be used for a multitude of innocent purposes. The input capacitor incorporated into its circuitry was necessary to its proper operation without regard to the legality of its employment. The component performed importance functions wholly divorced from the purpose of detection avoidance. Although the homemade amplifier may well have been built for the purpose of surreptitious interception of wire communications, and although it was being so employed when discovered by police, its design characteristics do not render it primarily useful for that purpose. Defendant's conviction under § 2512(1)(b) must therefore be reversed.

REVERSED.

Only one Government witness, Mr. Siebert, addressed the issue, testifying as follows:

Q. You talked in terms of a capacitor and in terms of input and you stated, and if I'm wrong, correct me, but did you state that Defendant's Exhibit No. 2 [the Radio Shack amplifier] did not have an input or capacitor?

[Siebert:] It didn't have a capacitor input. The reason I say this is I purchased one to work on our electronic dialing equipment to use as a test device and I found out when I applied it to the line I put the circuit in trouble in dialing because it didn't have a small capacitor in series input.

Mr. Siebert's conclusion was based entirely on his perception that Defendant's Exhibit No. 2 (the Radio Shack amplifier) was identical to an amplifier he had used in the past and on his recollection that the earlier device had "put the circuit in trouble." He did not bother to examine the circuitry or the schematic diagram of the Radio Shack device to confirm his opinion.

Defendant's expert witness, however, did remove the back of the Radio Shack amplifier and examine the schematic, concluding that the device does in fact contain an input capacitor. A decision that the evidence was insufficient on this evidentiary point would probably require a retrial, if the point were controlling. For the purpose of this decision, however, we have assumed that the jury was free to believe Mr. Siebert rather than defendant's expert, and we accept as true the Government's distinction between the two amplifiers.