UNITED STATES of America, Plaintiff,

v.

Ron WYNN, formerly known as Ronald Eugene DeAngeles, Defendant.

Crim. No. 85–30002.

United States District Court, C.D. Illinois.

April 23, 1986.

Larry A. Mackey, U.S. Atty., Springfield, Ill., for plaintiff.

Allan Ackerman, Chicago, Ill., for defendant.

## ORDER

ROSZKOWSKI, District Judge.

On January 12, 1985, defendant Ron Wynn was indicted by a federal grand jury in an eight count indictment charging him with violations of 18 U.S.C. §§ 2512(1)(a), (b) and (c). Count I charged Wynn with a violation of Section 2512(1)(c) for advertis-

ing various devices primarily designed for the surreptitious interception of wire or oral communications.[1] Counts II, III and IV charge Wynn with violations of Section 2512(1)(a) for mailing various devices primarily designed for the surreptitious interception of wire or oral communications.[2] Counts V, VI and VII charge Wynn with violations of Section 2512(1)(b) for selling the various devices of Counts II, III and IV, respectively.[3] Count VIII charges Wynn with an additional violation of Section 2512(1)(b) for selling various other devices primarily designed for surreptitious interception of wire or oral communications.

The parties have submitted stipulated facts to this court. While the parties have suggested that oral argument might aid this court in disposition of this matter, a full review of the evidence submitted has proven such a hearing unnecessary; the concise argumentative memoranda presented by the parties adequately substitutes for any additional oral argument. For the reasons stated herein, this court finds defendant Wynn guilty as to all counts.

## I. BACKGROUND

The undercover investigation that led to the indictment in this case began in the spring of 1984. The investigation was initiated by Special Agent Kerry Galloway, supervisor of the Technical Investigation Section, Division of Criminal Investigation of the Illinois Department of Law Enforcement.

Posing as Terry Bergschneider a private investigator for ABLE Detective Agency, on April 24, 1984 Special Agent Galloway mailed Wynn a letter requesting that Wynn send him a copy of Wynn's literature and pricing information concerning electronic surveillance equipment. Gov't Exhibit # 1. On May 14, 1984, Special Agent Galloway received an envelope from Wynn containing a publication entitled "Electronic Eavesdropping and Secure Communications."[4] This catalog contained seven pages of advertisements for electronic devices. Gov't Exhibit # 3.

The mailing of this catalog forms the basis of Count I.

The next definite contact that Special Agent Galloway had with Wynn was on June 1, 1984. On that day, he placed a recorded telephone call to Wynn in Houston from the Springfield office of the Division of Criminal Investigation.

---

**1.** 18 U.S.C. § 2512(1)(c) provides in relevant part that:

 (1) ... any person who willfully—

 (c) places in any ... handbill, or other publication any advertisement of—
 (i) any electronic ... device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire oral communications ...
 knowing or having reason to know that such advertisement will be sent through the mail or transported in interstate ... commerce, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** 18 U.S.C. § 2512(1)(a) provides in relevant part that:

 (1) ... any person who willfully—
 (a) sends through the mail ... any electronic ... device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**3.** 18 U.S.C. § 2512(1)(b) provides in relevant part that:

 (1) ... any person who willfully—

 (b) ... sells any electronic ... device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications, and that such device has been or will be sent through the mail or transported in interstate ... commerce;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** For ease of understanding, certain details concerning the investigation such as specific addresses and phone numbers will be excluded from this order. These details are well set forth—uncontested—in the government's stipulated facts.

Galloway identified himself as being with the ABLE Detective Agency in Springfield, Illinois. Galloway told Wynn that he was interested in a Model PT–103 Drop-In Telephone Microphone. Galloway told Wynn that he would be using the PT–103 in a "business complex" and was concerned with the range and security of the signal. Wynn informed Galloway that the signal from a PT–103 could travel up to five hundred feet and that unless the building had solid steel walls, the presence of some steel construction would not interrupt the signal. As to the "security" of the signal, Wynn told Galloway to "put a note" in his order to specify T.V. band. That way, people within the business complex with FM radios would not pick up the signal. Gov't Exhibits # 5 and # 6.

During this conversation, Wynn also explained that the only difference—other than price—between the PT–103 and the PT–101 Telephone Wireless Microphone. Wynn stated that the PT–101 needed to be wired in while with the PT–103 "you just unscrew the cap and replace the cartridge." *Id.*

Galloway and Wynn also discussed the purchase of a model SR–1000 receiver/recorder. Wynn explained that the SR–1000 "goes on when the phone is picked up" so that the device would only record during conversations. The SR–1000 had the receiver and recorder contained in one unit. Wynn explained that the receiver needed "puttin together" and informed Galloway that he could have it by the end of the next week. *Id.*

Wynn suggests that he first received a telephone call from a man named "Terry" sometime in May of 1984. Wynn recalls that Terry told him he was a licensed private investigator or detective working with or for ABLE Detective Agency in Illinois. Wynn also recalls that Terry told him that he had a client who had either a company or corporation and that the case involved "security." Wynn recalls Terry saying that ABLE did a great deal of industrial security work. This alleged telephone conversation went unrecorded and took place some few weeks prior to the June 1 recorded conversation. Wynn's recollection as to the substance of this unrecorded call matches the substance of the June 1 recorded call.

In any event, on June 4, 1984, Special Agent Galloway mailed Wynn a confirming letter for the purchase of the PT–103 transmitter and the model SR–1000 receiver with recording capability. This letter informed Wynn that "as we discussed, the telephone conversation to be listened to must not be overheard by anyone other than myself. This is absolutely imperative. You suggested that I remind you to have the equipment work on the T.V. band." The letter also stated that the "equipment must be capable of recording telephone conversations when I am not present with the tape recorder." Gov't Exhibit # 7. Special Agent Galloway enclosed a bank counter check for $600 made payable to Wynn Engineering Company signed by Terry Bergschneider, Galloway's undercover identity. Gov't Exhibit # 8.

On July 3, 1984, Special Agent Galloway again telephoned Wynn in Houston, this time to check on the status of his order. Wynn informed Galloway that the order had been delayed due to the time associated with clearing the check. Gov't Exhibits # 9 and # 10. On July 5, the $600 check arrived back in Springfield at ABLE, stamp endorsed by Wynn Engineering Company. On July 23, Special Agent Galloway received (in care of ABLE) a package from Wynn Engineering Company containing one model PT–103 drop-in telephone microphone (Gov't Exhibit # 12) and one model SR–1000 receiver with recording capability (Gov't Exhibit # 13). The package also contained a handwritten set of instructions for the proper installation and use of the SR–1000. Gov't Exhibit # 14. The instructions were on Wynn Engineering Company letterhead and were handwritten by Wynn. *Id. See* Stipulated Testimony of FBI Agent Jon Osgood and unidentified FBI "Handwriting Expert."

Count V is based on the interstate sale of these items; Count II is based on the interstate mailing of these items.

On July 26, Special Agent Galloway placed another recorded telephone call to Wynn Engineering in Houston. Wynn instructed Galloway on the proper placement of transmitters both inside of telephones and at the telephone junction box. As to drop-in microphones, Wynn stated: "just a drop-in is not so easy for 'em to find".

Galloway also inquired as to whether Wynn could install a transmitter inside of a clock so that Galloway could overhear conversations in a businessman's private office. Galloway informed Wynn that he wanted a recording system that would activate only on sound. This was necessary he said because he would only have access to the business complex parking lot during the lunch hour and could therefore not change the tape frequently. Wynn told Galloway that he could install a transmitter in a clock so that it would not be noticeable. This clock could thus replace the clock in the businessman's office.

Based on this conversation Galloway ordered one model PT–101 Telephone Wireless Microphone, one model PT–102 Long Range Telephone Microphone, and one model L111 telephone listening device. Gov't Exhibits # 15 and # 16.

As with his first order, on July 31, Special Agent Galloway mailed a letter to Wynn confirming the details of this order. In his letter, Galloway informed Wynn that:

> These devices will be used in conjunction with our previously purchased SR–1000 receiver. I would request the transmitters again be placed on the television band frequency to assure total confidentiality of our listening capabilities from being overheard by anyone other than myself.

Gov't Exhibit # 17. Galloway enclosed an ABLE check for $300 made payable to Wynn Engineering Company. Gov't Exhibit # 18. This check was received back in Springfield on September 17 stamp endorsed by "Wynn Engineering Company". *Id.*

On August 28, Special Agent Galloway received a package in the mail from Wynn (Gov't Exhibit # 19) containing the PT–101 (Gov't Exhibit # 20), the PT–102 (Gov't Exhibit # 22) and the L–111 (Gov't Exhibit # 21). The package also contained two pages of handwritten instructions on Wynn Engineering letterhead detailing the proper installation of the PT–101 and the PT–102. These instructions were written by Wynn. *See* Stipulated Testimony of FBI Agents Osgood and unidentified FBI "Handwriting Expert."

Count VI is based on the interstate sale of these items; Count III is based on their interstate mailing.

On September 14, Special Agent Galloway again placed a recorded call to Wynn in Houston. Galloway informed Wynn that he had decided to use a transmitter hidden in a lamp rather than in a clock. Wynn told Galloway that a lamp would work. Galloway told Wynn that he wanted to place the receiver in a car in the parking lot of the business complex where the lamp was to be planted. Wynn said that he had a transmitter that would transmit 100 yards. Wynn told Galloway that he could place a transmitter in the lamp so as to exactly duplicate the lamp in the businessman's office. Galloway told Wynn he would send the lamp. Gov't Exhibits # 24 and # 25.

On September 17, Special Agent Galloway sent the lamp to Wynn in Houston. In the letter sent with the lamp, Galloway reiterated that the hidden transmitter must transmit audio indefinitely without the need for batteries. Galloway stressed to Wynn the importance of not altering the appearance of the lamp: "(this is imperative) the lamp must not be altered in physical appearance in any manner." In this way, the lamp would be kept identical to the one it would replace and could be substituted undetected. As with the earlier orders, Galloway requested that the transmitter be placed on television frequency for greater secrecy. Galloway specified that

the audio be capable of transmitting 100 yards to a receiver in a nearby parking lot. Galloway closed by telling Wynn that he would contact him on September 20 to find out the total cost of the transmitter and altered lamp. Gov't Exhibit # 26.

As promised, on September 20 Special Agent Galloway called Wynn. Wynn told Galloway that he had received the lamp. Wynn stated that the cost of installing the transmitter would be between three and four hundred dollars. Wynn informed Galloway that the transmitter would transmit over 100 yards. Wynn assured Galloway that he would not alter the lamp's appearance and that it would be ready in a week or so. Gov't Exhibits # 27 and # 28.

The next day, Special Agent Galloway sent Wynn an ABLE check for $400. Gov't Exhibit # 30. Galloway stated in the accompanying letter that the $400 was payment for the "design of the necessary modifications to my lamp." Gov't Exhibit # 29.

On October 9, Special Agent Galloway received a package in the mail from Wynn containing the modified lamp. Gov't Exhibit # 31. As requested, Wynn had placed a transmitter inside the lamp without altering its appearance. Gov't Exhibit # 32.

The interstate sale and shipment of this modified lamp forms the basis for Counts VII and IV, respectively.

The undercover investigation of Wynn now began to reach a head. On October 12, Special Agent Galloway called Wynn to tell him that the modified lamp had been received. Wynn stated that he wouldn't do another for $400: "It was a little more work than I thought."

Galloway informed Wynn that he wanted to place a large order for sale to several other people. Galloway then placed an order for 1 model 2000 Cigarette Package Transmitter, 2 model PT–101 Telephone Wireless Microphones, 2 model PT–102 Long Range Telephone Microphones, 7 model PT–103 Drop-In Telephone Microphones ("a big hit"), and 4 model SR–1000 special receivers. Wynn gave Galloway a 10% discount. Wynn advised Galloway

that it would take a week to put the order together and agreed that Galloway could pick up the items at Wynn's home in Texas.

Galloway told Wynn that he was selling the items to four detective groups. Galloway stated that one of the groups did security work for a corporation and one of the groups did "husband and wife things". Galloway emphasized to Wynn that it was important for the signal from the items to be "secure" (T.V. band) since they were to be used in a corporation's building. In response to a "question" that Galloway's "customers" had, Wynn stated that he could place the transmitters on different frequencies so that three different offices in close proximity could be monitored separately. Wynn told Galloway of a one-year guarantee on the items. Wynn advised Galloway that the items would be ready in a week if he didn't have a bunch of other orders. Wynn also told Galloway that he had more items that he could sell right away if Galloway was interested. Gov't Exhibits # 33 and # 34.

On October 12, Special Agent Galloway sent Wynn a letter confirming the order for the M–2000's, PT–101's, PT–102's, PT–103's and the SR–1000's. As with the previous orders, Galloway stated that the transmitters must be placed on the more private television band. Galloway also stated that the receiver for the PT–102's would be in an office directly above the one bugged. Special Agent Galloway advised Wynn that he would be in Wynn's area and would pick up the items and pay Wynn in cash. Gov't Exhibit # 35.

On October 22, Special Agent Galloway called Wynn in Houston. Wynn told Galloway that he had figured the price of the items incorrectly and that the correct price was $3,800 but with a 10% discount the total dropped to $3,420. Wynn advised Galloway that he was a "little behind" in preparing the order and that it would be ready in a week. Galloway told Wynn that he would be in Texas the week of November 11 and that he would call Wynn on Wednesday of that week. Galloway again informed Wynn that he would pay in cash.

When asked whether he would be able to prepare additional items on short notice—specifically the drop-in telephone transmitters and a special receiver—Wynn answered "for a set like that it takes a day to put it together." Gov't Exhibits # 36 and # 37.

On November 13, Special Agent Galloway travelled to Houston, Texas. In Houston he placed a call to Wynn from the local FBI office. Galloway and Wynn arranged to meet the next day. Gov't Exhibits # 38 and # 39.

In a telephone conversation the next day, Special Agent Galloway and Wynn arranged a meeting at Wynn's house. Gov't Exhibits # 40 and # 41. Galloway and FBI Special Agent Martin Patterson went to Wynn's home where, acting undercover, they were greeted by Wynn and welcomed in.[5] Wynn acknowledged that he had spoken "alot" with "Bergschneider" (Galloway) on the telephone.

Once inside, Wynn informed Galloway that he had his order finished. Wynn explained the operation of the SR–1000 special receiver. He advised Galloway that the SR–1000 would work with all of the other devices in the order.

Wynn and Galloway next discussed the Model 2000 Cigarette Package transmitter. Wynn informed Galloway that he could not provide the advertised plastic Winston cigarette case for the device since the Winston company had forced the company that made them to stop. Wynn added however that the device could be placed inside a cardboard cigarette package.

Galloway expressed concern about placing too many details as to how he intended to use the devices in letters to Wynn. Wynn stated that he didn't see any problem. Wynn also pointed out that no one could find out that ABLE dealt with him since he didn't give out mailing lists.

Wynn and Galloway also discussed the possibility of constructing an eavesdropping device for a businessman's office that could not be detected during a "sweep" of the office. Wynn commented that some of the local oil companys hired outside agencies to occasionally check their offices. Wynn informed Galloway that such a device was possible but that it might get too large. Wynn estimated its price at around $1000.

In answer to a question by Galloway, Wynn stated that he had heard of eavesdropping devices being placed in wall outlets. He stated that he had seen such devices but cautioned that they were dangerous since they got hot.

Wynn also explained to Agent Galloway how he could avoid legal problems when selling the devices to others. Wynn advised Galloway to tell the buyer that the devices were "microphones", not "bugs", and that he could not be responsible for whatever the buyer used it for. Wynn informed Galloway of a friend of his that had "beat" an indictment in Las Vegas.

Following this conversation, Wynn, Galloway and Patterson left Wynn's house and placed all of the items (Gov't Exhibits # 44 thru # 48), in the trunk of Galloway's car.[6] The sale of these items for interstate transport forms the basis of Count VIII.

Immediately after the devices were placed in Galloway's car, Patterson identified himself to Wynn as an FBI agent. Several FBI agents, Texas State Police officers and Houston police officers then executed a search warrant on Wynn's home.

Wynn does not contest the accuracy of any of the recorded telephone conversations. Wynn does contest various portions of the body microphone recording made at his home on November 14. He has submitted with his stipulation changes to six pages of the transcript of this recording. Of the changes he makes, all are minor and bear at best minimally on the substance of the charges. Only one change arguably bears on the resolution of this case: in response to Special Agent Galloway calling

---

**5.** Special Agent Galloway wore a NAGRO body recorder to record this transaction. *See* Gov't Exhibits # 42 and # 43.

**6.** The government recorded this on video tape. Gov't Exhibit # 49.

the transmitters "bugs", Wynn stated that "these are not bugs that's ilegal [sic] these are wireless microphones." Having listened to the tape, this court can find no support for this insertion; the transcription appears to be accurate. In any case, it is clear that later in the tape Wynn does say that the devices he was selling to Galloway were not "bugs". Wynn consistently refers to the devices as "wireless microphones" or "microphones". Thus, Wynn's insertion adds little if anything to the substance of the conversation.

## II. DISCUSSION

There is no dispute in this case that Wynn advertised, sold or made the devices that form the basis of the indictment. Wynn argues that: (1) the devices are not "primarily useful for the purpose of surreptitious interception of wire or oral communications" ("PSIC"); and, (2) even if they are, he did not possess the requisite criminal state of mind for a violation of Section 2512. The government of course takes the opposite position regarding each contention.

## A. PRIMARILY USEFUL FOR SURREPTITIOUS INTERCEPTION

■ Interpreting the legislative history and language of Section 2512, the Seventh Circuit recently stated:

The statute was intended to focus on a relatively narrow category of devices and apparatus whose *design* renders them useful *primarily for surreptitious* listening. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 94–95, *reprinted in* 1968 U.S. Code Cong. & Ad.News 2112, 2183 ["Senate Report"]. The statute was not intended to prohibit the use of a device merely because it may be adapted to wiretapping or eavesdropping; by the same token, however, a device does not fall outside the ambit of the statute merely because it may have innocent uses. The inquiry is to be directed toward whether the device is designed in such a way that its "principal use is

*likely* to be for wiretapping or eavesdropping." *Id.* (emphasis added).

*United States v. Pritchard,* 745 F.2d 1112, 1114, 122–23 (7th Cir.1984) (*Pritchard I*). *See also United States v. Pritchard,* 773 F.2d 873, 878–79 (7th Cir.1985) (*Pritchard II*); *United States v. Bast,* 495 F.2d 138, 143 (D.C.Cir.1974). In determining whether the primary use of a device is for wiretapping or eavesdropping, "the sort of judgment called for ... in close cases ... warrant[s] the use of expert testimony." Senate Report at 95, U.S.Code Cong. & Admin.News 1968, p. 2183.

■ The government presents two expert witnesses in this regard: Special Agent Kurt Schmid of the Illinois Department of Law Enforcement and Supervisory Special Agent Charles Wilmore, Jr., of the FBI. As a preliminary matter, this court rejects Wynn's opinion that neither of these witnesses are qualified to render an expert opinion in this case. Special Agent Schmid has a technical electronics background and lists extensive experience concerning the electronics of eavesdropping devices. Special Agent Wilmore has been with the FBI for 20 years and has extensive experience with electronic communications devices. Importantly, Special Agent Wilmore was accepted as an expert witness concerning electronic eavesdropping devices in both *Pritchard I* and *Pritchard II.*

Special Agent Schmid opined that each device listed in the indictment was designed primarily for surreptitious interception. He found that the PT–103 Drop-In Telephone Microphone had a virtually infinite life, was easily installed and had only a remote possibility of discovery.

Schmid determined that the SR–1000 receiver with recording capability was a commercially available radio receiver that had been modified by the addition of two toggle switches and voice operated relay (VOX) circuitry.

One toggle switch disables the receiver's speaker for covert listening purposes. The second toggle switch incorporates VOX circuitry.... With the toggle switch in the position where the VOX is

in circuit, the tape recorder ... operates only when activity is occurring in the target area thus conserving recording tape.

Gov't Stipulation at 23–24. The modifications in Schmid's opinion render the otherwise commercially available receiver/record "PSIC."

As to the PT–101 Telephone Wireless Microphone, Special Agent Schmid found that its small size made it easily concealable; its use of telephone line power gave it infinite life; and, its "RF" nature allows remote monitoring. Based on these characteristics Schmid determined that the PT–101 is PSIC.

Special Agent Schmid found the model L111 Telephone Listening Device to be an "Archer" brand telephone line amplifier that had been modified with alligator clip hook-up leads. Schmid found that the alligator clips allowed for quick connection to telephone line terminals and prevented use of the device with the modular-jack system normally found in business or residential telephone systems. Wynn's modification of this commercially available device rendered it PSIC in Schmid's opinion.

Special Agent Schmid determined that the PT–102 Long-Range Telephone Microphone is a long range "RF" transmitter designed for wiretapping. Its small size makes it easily concealable; its alligator clips allow it to be quickly "planted" at any point along a telephone line; its increased "RF" power allows remote monitoring at greater distances. Schmid opined that this device is specifically designed for covert installation and clandestine monitoring and recording of wire or oral communications and that it was therefore PSIC.

The table lamp that Wynn had modified for Special Agent Galloway was also considered PSIC by Schmid due to the transmitter hidden in the lamp's base.

Special Agent Schmid found the M–2000 Cigarette Package Transmitter PSIC, but *only* when placed in a cigarette package.

Special Agent Schmid also gave his opinion that Wynn's catalog, "Electronic Eaves-

dropping and Secure Communications", contains advertisements for PSIC device since all of the above devices are advertised in the catalog.

Special Agent Wilmore's expert opinion is much the same as that of Special Agent Schmid. Wilmore unqualifiedly found the PT–101, PT–102 and PT–103 to be PSIC.

As to the SR–1000, Agent Wilmore found that:

Although the GE radio cassette recorder is not an item designed for surreptitious interception of communications, that portion of the device consisting of the two added switches is a system designed to be primarily useful for the surreptitious interception of wire communications when use with [the PT–103, PT–101 and the PT–102].

Gov't Stipulation at 33.

As to the L111, Agent Wilmore found that:

This device [was] originally designed to be attached to a telephone through the use of a suction cup pickup and amplifies the caller's voice.

The modification of the device [the alligator clips] allows it to be connected with the alligator clips to the telephone line or terminals at a point removed from the telephone and the user can listen to both sides of the conversation without the knowledge of either party.

*Id.* at 35.

Agent Wilmore examined the modified table lamp and determined that the components of an M–2000 Cigarette Package Transmitter had been hidden in the base. A transformer had been added so that the transmitter could run off the AC lamp power instead of battery power. The transmitter sent out an FM signal whenever the lamp was plugged in. This signal could be received and recorded by the SR–1000. Wilmore considered the modified lamp PSIC.

The only device Agent Wilmore found *not* to be PSIC was the M–2000 Cigarette Package Transmitter. In his opinion, while the M–2000 could be *used* for surreptitious

interception of oral communications, its "design is not such as to render it primarily useful for this purpose." Gov't Stipulation at 37.

Like Agent Schmid, Agent Wilmore was of the opinion that Wynn's catalog advertised and offered for sale PSIC devices because the above devices (the PT–101, PT–102, and PT–103) were shown.

■ In an attempt to counter the opinions of Agents Schmid and Wilmore, Wynn offers himself as an expert. Wynn offers a fairly extensive list of his electronics experience. For purposes of fair disposition of this case, this court will consider Wynn's electronics experience sufficient to qualify him as an expert. Even as an expert Wynn fails to refute the government's evidence.

As to the PT–101, PT–102 and PT–103, Wynn states that had he intended them to be PSIC, they would have been crystal controlled with harmonic filters and would have operated on VHF frequency 150 to 172 MHz. Since the PT–101, PT–102 and PT–103 have none of these features, they could be heard by anyone and are thus incapable of being PSIC. Wynn calls all of these devices essentially pieces of "junk".

Wynn's argument is unpersuasive. The fact that these devices could have been better designed in no way rebuts the opinions of Agents Schmid and Wilmore that these devices were designed primarily for surreptitious interception. Section 2512 does not require perfect design of bugging devices but rather merely requires that the devices' primary design be for secret monitoring.

Wynn also suggests that the PT–102 and PT–103 are not PSIC since they are equivalent to the commercially available Radio Shack FM Wireless Microphone. Even assuming that the items are similar—which this court can easily see they are not—this in no way rebuts the fact that they are PSIC. Also, Wynn cannot successfully argue that he can not be prosecuted under Section 2512 based on the PT–102 and PT–103 since Radio Shack is not prosecuted based in its wireless microphone. As the Seventh Circuit recently stated in *Pritchard II:*

> The fact that one person is not prosecuted for his possible criminal conduct does not immunize another for engaging in the same or similar conduct.

773 F.2d at 879.[7]

As to the SR–1000 receiver/recorder and the L111 telephone listening device, Wynn points out that but for his minor modifications, these devices are also similar to the other commercially available devices. First this argument must fail for the same reasons stated above. Also, it is exactly these "minor" modifications which lead the government experts to classify the devices PSIC.

■ Wynn next argues that the SR–1000 and the L111 cannot form the basis for a conviction under Section 2512 because the government experts considered them PSIC only when used in conjunction with other items *e.g.* the PT–102 and PT–103 transmitters. The modifications to each device were added however so that each device was then designed primarily for the purpose of surreptitious interception of communications. The fact that the devices might still have had innocent uses does not prevent a conviction under Section 2512 where their primary use is for surreptitious interception. *See Pritchard I,* 745 F.2d at 1123. Also, in this court's opinion, the fact that they required a signal from a transmitter does not remove their PSIC nature. In any event, the SR–1000 was sold and delivered with a PT–103 transmitter and the L111 was sold and delivered with both a PT–101 and PT–102. Each of these transmitters is clearly PSIC and can therefore independently support a conviction under Section 2512.

---

7. For the same reason, Wynn's argument concerning the government sale of surplus, possibly PSIC, devices must fail. In addition, Section 2512(2) specifically precludes governmental liability.

Citing *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 73 L.Ed. 1117 (1931) and *Cramer v. Fahner,* 683 F.2d 1376 (7th Cir.1982), Wynn argues that, assuming the SR–1000 and the L111 are not PSIC, conviction on the counts which contain these devices would amount to an unconstitutional "general verdict". To this end, the court in *Cramer* stated:

> Where a verdict is supportable on one ground but not another, *and it is impossible to tell which grounds the jury selected, the conviction is unconstitutional.*

683 F.2d at 1380 (citations omitted) (emphasis added). The point of *Cramer* and the other cases dealing with "general verdicts", however, is that a conviction cannot stand where it is possible that it might be based solely on legal conduct. That possibility is not present in this case. In the first place, this court believes that both the SR–1000 and the L111 support convictions under Section 2512. In any event, the transmitters included in the counts containing these devices are PSIC and therefore properly form the basis for a Section 2512 conviction. Thus there is no possibility that Wynn's conviction is based solely on the potentially nonviolative SR–1000 and L111. *See Pritchard I,* 745 F.2d at 1123 ("We need not address appellant's arguments relating to the apparatus introduced as government exhibit 12 and 13; we believe that the apparatus comprising exhibit 11 alone provided a sufficient basis on which to convict appellant under section 2512").

Wynn relies on *United States v. Schweihs,* 569 F.2d 965 (5th Cir.1978), for the proposition that the L111 is not PSIC because the mere addition of alligator clips to a non-PSIC device does not make that device PSIC. It is true that the court in *Schweihs* stated that "the mere addition of alligator clips [does not] make unlawful that which by itself was lawful". *Id.* at 971. Unlike the present case, however, the record in *Schweihs* contained no evidence that the device to which the alligator clips was added "was 'primarily useful' for covert listening". *Id.* at 969. Also, the

government experts in *Schweihs* both focused on *the use* being made of the device rather than its "primary usefulness based on design". *Id* at 967–70. In contrast, the government experts in this case both found that the *design* of the L111 rendered it PSIC.

Once again, even if the L111 is not PSIC as suggested by Wynn, the transmitters contained in Counts III and VI (the L111 counts) independently support a conviction under Section 2512.

As to the modified lamp, Wynn argues that it is not PSIC since it "had to be tested with another exhibit in order for the expert to conclude that the lamp was violative of 18 U.S.C. § 2512." Defendant's Memorandum at 10. The expert testimony stands unqualified and uncontradicted however that this modified lamp is PSIC.

Given the conflicting opinions regarding the M–2000 Cigarette Case Transmitter, this court does not believe that the government has shown beyond a reasonable doubt that it is PSIC. As with the SR–1000 and the L111, however, the count containing this device contains other clearly PSIC devices which support a conviction under Section 2512.

In summary, each count of the indictment contains at least one illegal PSIC device which can form the basis for conviction under Section 2512.

### B. CRIMINAL INTENT

For conviction under Section 2512(1)(a), a person must have "willfully" sent through the mail an electronic device "knowing or having reason to know" that the device was PSIC. Section 2512(1)(b) requires a person to have "willfully" sold an electronic device "knowing or having reason to know" that the device was PSIC and that the device would be sent through the mail or transported in interstate commerce. Section 2512(1)(c) requires that a person have "willfully" placed in any handbill or publication any advertisement of an electronic device "knowing or having reason to

know" that the device was PSIC and "knowing or having reason to know" that the advertisement would be sent through the mail. Thus, for a conviction under any of these sections, Wynn must have "known or had reason to know" that the devices were PSIC.[8]

■ Throughout his stipulation and his memorandum, Wynn insists that he never intended to violate any federal or state laws. Specifically, Wynn states that he consulted FCC regulations to make sure the devices did not run afoul of FCC rules; that between 1979 when he began operations and 1984 when the search warrant was executed no one accused him of violating any law; that his catalog listed non-PSIC uses for the devices; and, that this catalog specifically informed purchasers that eavesdropping was illegal. Wynn also offers the testimony of his wife that the business telephone number was listed in the telephone book and that on nice days, Wynn worked in the garage with the door open.[9]

■ As the government correctly notes however the recorded conversations in this case are replete with evidence that Wynn had the requisite knowledge that these devices were PSIC. On numerous occasions Wynn and Special Agent Galloway discussed the illegal uses for which Galloway sought the devices. Wynn also instructed Galloway on the proper device to use and how to install the devices in a surreptitious manner. On at least one occasion Wynn told Galloway that "just a drop-in is not so easy for 'em to find." Wynn even went so far as to tell Galloway that he could avoid illegal conduct by telling any purchasers that the devices were "microphones", and not "bugs" and that he could not be responsible for how the devices were used.

Wynn cannot avoid conviction under Section 2512 simply by surrounding himself with disclaimers and closing his eyes to the nature and use of the devices. The evidence is overwhelming that Wynn knew the illegal nature of the devices he advertised, sold and shipped. The fact that Wynn was not earlier prosecuted for his conduct is irrelevant; the government finally discovered his illegal conduct and has successfully proved its illegality.

## C. CUMULATIVE PUNISHMENTS FOR THE SAME OFFENSE

Wynn argues that he cannot be convicted on separate counts for mailing and selling the PSIC devices. "[T]he government [may not] divide up the same transaction into multiple counts within the same statutory framework...." Defendant's Memorandum at 5. While this argument may be true with respect to certain statutory violations, it is not correct with respect to Section 2512(1)(a) and (b).

Faced with a similar contention in a recent criminal tax violation case, the Seventh Circuit set forth the relevant inquiry. In its recent opinion in *Garrett v. United States* [— U.S. —] 105 S.Ct. 2407 [85 L.Ed.2d 764] (1985), the Supreme Court discussed the double jeopardy analysis to be undertaken when the same conduct violates two statutory provisions. The first step is to determine whether Congress intended that each violation be a separate offense. "There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction*." *Id.* [105 S.Ct.] at 2412 (emphasis in original), *quoting Blockburger v. United States*, 284 U.S. 299, 304 [52 S.Ct. 180, 182, 76 L.Ed. 306] (1932). The inquiry is into the language, struc-

---

**8.** Wynn does not contend that he did not "willfully" perform any of the required conduct. Nor does Wynn suggest that he was unaware that his catalog or the devices he sold were to be sent through the mail.

**9.** Wynn also suggests that he should escape conviction in this case because the record shows that he thought that he sent his catalog and sold the devices to law enforcement officials. Wynn states that such conduct would not violate Section 2512. This court finds no support for this contention either in fact or in law.

ture and legislative history of the statutes involved. *Garrett,* 105 S.Ct. at 2412. If the legislative intent is unclear, it can also be inferred by using the test laid out in *Blockburger v. United States* —whether "[e]ach of the offenses created requires proof of a different element." *See Garrett,* 105 S.Ct. at 2411, quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182.

*United States v. Foster,* 789 F.2d 457 (7th Cir., 1986).

 Nothing in the legislative history nor in the plain language of Section 2512 suggests that a person cannot be convicted separately for selling and then mailing PSIC devices. Also, as with the statutes in *Foster,* a violation of Section 2512(1)(a) does not necessarily entail a violation of Section 2512(1)(b). *See Foster,* at 460. For example, were illegal PSIC devices sent through the mail without a sale, Section 2512(1)(a) would be violated; Section 2512(1)(b) would not. Conversely, if a person sold illegal PSIC devices to another knowing that *that* person intended to mail the devices or transport them in interstate commerce, only Section 2512(1)(b) would be violated by the seller.

It is unnecessary to look any farther than this case for proof of this proposition. Wynn is guilty on Count VIII for having sold the items to Galloway knowing that Galloway would transport them interstate (§ 2512(1)(b)). Wynn could not have been indicted for interstate mailing (§ 2512(1)(a)) of these devices.

### III. CONCLUSION

For the reasons stated herein, defendant Ronald Wynn is guilty as to each of the eight counts in the indictment.