**UNITED STATES of America, Plaintiff,**

v.

**Dominic CORTINA, et al., Defendants.**

No. 89 CR 941.

United States District Court,
N.D. Illinois, E.D.

March 21, 1990.

Ira H. Raphaelson, U.S. Atty. by John Burley, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Thomas P. Sullivan, William A. Von Hoene, Jr., Jenner & Block, Chicago, Ill., for defendant Donald Angelini.

Philip C. Parenti, Philip C. Parenti, Ltd., Chicago, Ill., for defendant Joseph Spadavecchio.

Samuel V.P. Banks, Chicago, Ill., John C. Tucker, Lanexa, Va., for defendant Dominic Cortina.

## MEMORANDUM ORDER

BUA, District Judge.

On November 8, 1989, the United States filed a two-count information asserting criminal charges against defendants Dominic Cortina, Donald Angelini, Joseph Spadavecchio, and seven other defendants. Count One charges that each defendant conspired with the other to conduct an illegal sports gambling operation in violation of 18 U.S.C. § 1955. Count One specifically alleges that Cortina was the leader/organizer, while Angelini and Spadavecchio were managers/supervisors of the illegal bookmaking ring, which began sometime in 1983 and lasted until June 1989. Count Two charges that defendants violated 26 U.S.C. § 7203 by failing to supply information relating to their illegal operation required by the regulations of the Internal Revenue Service.

On November 14, 1989, all ten defendants pled guilty to the charges in both counts of the information.[1] The plea agreements executed by defendants Cortina, Angelini, and Spadavecchio contain certain preliminary calculations regarding the sentencing range applicable to each defendant under the United States Sentencing Commission Guidelines ("the Guidelines"). At the same time, the agreements reserve to the defendants and the government the right to contest certain sentencing issues, including whether defendants should be as-

---

1. The other seven defendants—Raymond J. Tominello, Joseph Rosengard, Anthony Carvatta, Leonard Zullo, Richard Catezone, Louis Michael Parrilli, and John Charles Parrilli—have already been sentenced.

signed offense level points pursuant to § 3B1.1 of the Guidelines for their role in the offense and whether an upward departure from the Guideline ranges applicable to these defendants is appropriate. On February 27, 1990, the court held a sentencing hearing at which both the defendants and the government presented evidence and made arguments relative to the proper Guideline calculations and the appropriate sentence for each defendant. This order resolves those issues and sets forth the sentence for each defendant.

## I. OFFENSE LEVEL

The government and the defendants agree that pursuant to § 2E3.1 of the Guidelines the base offense level attributable to each of the defendants is 12. The government argues that these base offense levels should be increased pursuant to § 3B1.1 of the Guidelines because of defendants' roles in the offenses. Specifically, the government maintains that Cortina should receive a 4-level increase pursuant to § 3B1.1(a) for his role as a leader/organizer of the gambling ring, and that Angelini and Spadavecchio should receive increases of 3 levels pursuant to § 3B1.1(b) because of their roles as managers/supervisors in the operation.

■ The defendants object in concert to these proposed increases. Defendants argue that the statute under which they are charged, 18 U.S.C. § 1955, already takes into account their roles in the operation. Defendants base their objection on the fact that a gambling operation is chargeable under § 1955 only where the illegal gambling business

> involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such a business; and ... [the business] has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955. Based on the language of § 1955, defendants argue that increasing their offense levels pursuant to § 3B1.1 would amount to "double-counting."

The court rejects defendants' argument. Although a violation of § 1955 does not occur unless the illegal gambling operation meets the above-cited requirements, an individual need not have a major role in the operation to be charged under § 1955. A person can be charged under that provision where he is merely a minor participant in the gambling operation, even if his role is simply as a telephone clerk or runner. *See United States v. Hunter,* 478 F.2d 1019, 1022 (7th Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973). Therefore, contrary to defendants' assertions, § 1955 is not a kingpin statute; it simply does not take into consideration defendants' roles in the offense. Accordingly, increasing defendants' offense levels pursuant to § 3B1.1 does not amount to "double-counting."

■ Aside from the double-counting argument, Angelini makes no other challenges to the assignment of 3 offense level points to him pursuant to § 3B1.1(b). Spadavecchio, however, raises several other arguments solely on his own behalf which challenge the assignment of additional offense level points to him for his role in the offense. First, Spadavecchio maintains that since the government wiretap experts identify him as a "writer/office worker; assist[ant] [to] Angelini," the court should find that he was not a manager or supervisor. This argument flies in the face of the express language of Spadavecchio's plea agreement, in which Spadavecchio admits to being a manager or supervisor. Furthermore, Spadavecchio's argument is based on the premise that the titles "assistant/office worker" and "manager/supervisor" are necessarily inconsistent. The premise is inherently flawed. Since Angelini was one of the top men in the gambling organization, Spadavecchio's designation as Angelini's assistant does not preclude the finding that he acted in the capacity of a supervisor or manager over other individuals in the operation. Similarly, the fact that Spadavecchio was an "office worker" does not necessarily show that he did not have management responsibilities. In fact, the same wiretap analysis to which Spada-

vecchio refers states that Spadavecchio assisted Angelini in *"overseeing* the operation of several locations which accept wagers from bettors." (Emphasis added.)

██ Spadavecchio also argues that even if he acted as a manager or supervisor, he should receive only a 2-level increase pursuant to § 3B1.1(c) because he managed a gambling room containing less than five persons. Under § 3B1.1(b), however, a defendant must receive a 3-level increase where he is a manager or supervisor "and the criminal activity involved five or more participants or was otherwise extensive." Here, Spadavecchio expressly admitted in his written plea agreement that he conspired with all of the other nine defendants in this case—and others—to conduct an illegal gambling operation. Moreover, the government's evidence clearly shows that the gambling operation in which Spadavecchio participated involved numerous individuals and was, by any measure, "extensive."

██ Spadavecchio's final argument regarding his role in the offense is that even if he is technically eligible for the 3-level increase provided for in § 3B1.1(b), the court should assign him only a 2-level increase due to the special circumstances of this case. Specifically, Spadavecchio argues that giving him a 3-level increase for his role in the offense will create the unjust anomaly of having his offense level equal to that of Angelini, who clearly had a higher managerial role than Spadavecchio. This court has no authority, however, to simply add or subtract offense levels as it desires. The court is bound to apply the plain meaning of the Guidelines as they are written. As Spadavecchio has astutely pointed out, if the court were considering whether to adjust his offense level for a mitigating role instead of an aggravating one, it would have greater latitude in assigning offense level points pursuant to § 3B1.2 of the Guidelines.[2] However, the Guidelines have no similarly flexible provision for the assignment of offense level points for aggravating roles, and this court will not judicially create one. If anything, the proper inference to be drawn from the Sentencing Commission's failure to have the same flexibility in § 3B1.1 as there is in § 3B1.2 is that no such flexibility was intended, not, as Spadavecchio suggests, that such flexibility was intended but was omitted by oversight. Accordingly, the court rejects Spadavecchio's arguments regarding his role in the offense. Spadavecchio must receive the 3-level increase provided for under § 3B1.1(b).

Cortina also makes an argument relating specifically to his role in the offense. Cortina argues there was no single gambling operation encompassing all the defendants in this case and, even if there were, he was simply a manager or supervisor, not a leader or organizer. Based on this argument, Cortina asserts that if his offense level is increased at all for his role in the offense, he should receive only a 3-level increase pursuant to § 3B1.1(b), not the 4-level increase provided for in § 3B1.1(a).

The evidence in this case belies Cortina's argument that all the defendants were not engaged in a single illegal gambling operation. Wiretap evidence contains discussions which show interaction among virtually all the defendants regarding the placement of bets, the determination of the point spreads and lines, and the payment and collection of gambling debts. Physical evidence also shows significant interaction among Cortina, Angelini, and other defendants on different dates and at various times of the day. Several individuals testified before the grand jury in this case that they received salaries for working on phones in different offices overseen by different defendants during the same time period. In addition, at least one of the defendants in this case—Raymond Tominello—admitted to taking bets on behalf of both Cortina and Angelini. In short, all of the evidence in this case, taken together, clearly shows the existence of a single

---

**2.** Section 3B1.2 authorizes the following offense level reductions: (a) a 4-level reduction for a defendant acting as a "minimal participant;" (b) a 2-level reduction for a defendant acting as a "minor participant;" and (c) a 3-level reduction for "cases falling between (a) and (b)."

gambling operation in which all defendants participated.

Nevertheless, the court is not convinced from the evidence the government has produced that Cortina was the leader or organizer of this operation. The government argues that the report and affidavit of retired FBI gambling expert William Holmes establishes that Cortina was a leader/organizer. Based on his review of the government's wiretaps, Holmes concluded in his report that Cortina was an "owner/partner" of the operation. As defendants have pointed out, however, Holmes' report contains bald, conclusory findings; Holmes does not specifically articulate the bases for his conclusions. Defendants argue that since Holmes' conclusions are not supported by references to specific facts, Holmes' report should not be considered at all in sentencing defendants because the report does not have a "sufficient indicia of reliability to support its probable accuracy" as required by § 6A1.3 of the Guidelines and 18 U.S.C. § 3661.

 The court rejects defendants' argument and finds that Holmes' report, which is supported by his affidavit, is sufficiently reliable to be taken into consideration in sentencing defendants. At the same time, however, the court cannot blindly rely on the conclusions of an FBI analyst in determining Cortina's role in the operation. In this court's view, a finding that Cortina was a leader/organizer is justified only if there is sufficient independent, corroborating evidence which supports Holmes' analysis. Here, there is almost no corroborating evidence of Cortina's role in the offense. The only other evidence the government offers regarding Cortina's role in the offense is evidence which it claims shows that: (1) Angelini regularly went to Cortina's house and not the other way around; (2) unlike the other defendants,

Cortina did not "work the phones," *i.e.*, he generally did not provide point spreads or accept wagers over the telephone—instead, Cortina's contact with bettors was limited to transactions with certain bettors who placed very large wagers; and (3) Cortina was personally involved in adding one of the offices for accepting bets by telephone.

The court finds that although this evidence may be interpreted as creating certain inferences regarding Cortina's role in the offense, none of this evidence is sufficiently strong to support a finding that Cortina was a leader or organizer, especially in light of the fact that the government has been monitoring the instant gambling operation since 1983. The government has the burden to show, by a preponderance of the evidence, that Cortina was a leader or organizer. *See United States v. Howard*, 894 F.2d 1085 (9th Cir.1990); *United States v. Urrego–Linares*, 879 F.2d 1234, 1237–38 (4th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989). In this case, although defendants may have used clever tactics to conceal their illegal activity as well as their roles in the gambling operation, more evidence is required than what the government has produced from its six-year investigation to justify a determination that Cortina was a leader or organizer.[3]

Therefore, the court will not assign to Cortina the 4-level increase provided for in § 3B1.1(a) of the Guidelines. Like Spadavecchio and Angelini, Cortina receives only a 3-level increase pursuant to § 3B1.1(b). After those adjustments are made, the adjusted offense level of each defendant is 15.

 One final adjustment to each defendant's offense level is appropriate. Both the government and the probation officer assigned to each defendant have represented to the court that defendants have dem-

---

**3.** Moreover, the determination of whether Cortina was a leader or organizer really has no effect on Cortina's sentence. The assignment of one additional offense level pursuant to § 3B1.1(a) would increase Cortina's sentencing range from 15–21 months to 18–24 months. As detailed more fully below, this court has determined that the appropriate term of imprisonment for Corti-

na is 21 months. Since this sentence falls within the range applicable to Cortina whether he is determined to be a leader (15–21 months) or not (18–24 months), the court's finding that the government has failed to prove Cortina's organizer/leader status is not crucial to the court's sentence. *See United States v. Tetzlaff*, 896 F.2d 1071, 1073 (7th Cir.1990).

onstrated an acceptance of responsibility for their criminal conduct. Based on these representations, the court finds that each defendant is entitled to the 2-level reduction for acceptance of responsibility provided for in § 3E1.1(a) of the Guidelines. This adjustment reduces each defendant's total offense level to 13.

## II. CRIMINAL HISTORY CATEGORY AND SENTENCING RANGE

The government and the defendants agree that based on their prior criminal records, Cortina and Angelini fall within criminal history category II, while Spadavecchio's record places him in criminal history category I. Under the Guidelines, these criminal history categories, taken in conjunction with each defendant's respective offense level, produce the following applicable sentencing ranges: Cortina, 15–21 months; Angelini, 15–21 months; Spadavecchio, 12–18 months.

## III. THE GOVERNMENT'S REQUEST FOR UPWARD DEPARTURE

The government claims that due to the particularly egregious and aggravating circumstances of this case, the imposition of any sentence selected from within the Guideline range applicable to each defendant is inappropriate in this case. Therefore, the government urges the court to depart upward from the applicable Guideline ranges pursuant to 18 U.S.C. § 3553(b) and § 5K2.0 of the Guidelines. Those provisions authorize the imposition of a sentence outside the Guideline range where "there exists an aggravating ... circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." The government argues that four such circumstances are present here. The court will address each of these in turn.

### A. The Extent of Defendants' Operation

■ The first grounds for upward departure, according to the government, is the overall breadth of the operation run by defendants. The government argues that defendants' operation was truly a business; the evidence shows that defendants had several offices, numerous salaried employees, and a vast clientele. Moreover, the government claims that defendants took in over $127 million in gross wagers during the six-year life of their bookmaking operation. This figure is derived from the calculations outlined in the affidavit of Rowland P. Wiemerslage, a Revenue Agent with the Internal Revenue Service who reviewed the government's evidence in this case. Wiemerslage reached his estimate of gross wagers by using a "reconstruction" method. After listening to the government's wiretap evidence and reviewing grand jury testimony, Wiemerslage first estimated the amount of wagers taken in an average week by each of the operations' four betting rooms during the football and basketball seasons. He then multiplied those per-week figures by the number of weeks per season and the number of years each betting office existed, which produced a gross wager amount for each betting office. Wiemerslage then added the four office totals and came up with $127 million.

Arguing that Wiemerslage's calculations are based on tenuous extrapolations from an extremely small sampling of the gambling operation, defendants have moved to strike Wiemerslage's affidavit pursuant to § 6A1.3 of the Guidelines. Defendants contend that these extrapolations are so implausible that they have no reliability whatsoever. The court agrees with defendants that Wiemerslage's calculations are filled with assumptions, conjecture, and speculation. However, much of the evidence on which Wiemerslage relies does show that defendants operated a high-volume bookmaking business which dealt in large sums of money. Although Wiemerslage's calculations do not definitively establish that defendants' operation received $127 million in gross wagers, Wiemerslage's compilation of the quantitative evidence in this case is helpful in comprehending the scope of defendants' operation. Thus, while the court does not agree with Wiemerslage's specific quantitative conclusions, the court does not reject Wiemerslage's opinion entirely. Instead, the court

considers Wiemerslage's analysis in light of all the other evidence in this case which relates to the extent of defendants' operation. Considering all of that evidence, the court finds the government has established that defendants ran a fairly large-scale bookmaking business in virtually every respect, including the number of employees, the number of bettors, the amount of money wagered, and the area in which it operated.

Defendants argue that even if their operation was large-scale, departure based on the magnitude of the operation is not warranted in this case because the statute under which they are charged—18 U.S.C. § 1955—already contemplates participation in a substantial gambling operation. Defendants also point out that although the Guidelines allow for upward adjustments in offense levels for crimes involving fraud and deceit depending on the amount of money involved, there is no provision in the Guidelines for upward adjustments of the offense level for gambling based on the amount of money involved. Defendants contend that this absence of a Guideline provision allowing upward adjustment for the amount of money involved in gambling offenses evidences the Sentencing Commission's intent to preclude such upward departures.

The court finds that neither the language of § 1955 nor the structure of the Guidelines precludes upward departure based on the size of the gambling operation.[4] However, both the statute and the Guidelines suggest that upward departure is warranted only where there is strong evidence indicating that the magnitude of the illegal gambling operation was substantially greater than that which is typical of an offense charged under § 1955. In addition,

as the court has previously noted, the Guidelines specifically state that in order to justify an upward departure, the court must determine that defendants' operation was extensive "to a degree not adequately taken into consideration by ... the Guidelines." *See* § 5K2.0 of the Guidelines; *see also* 18 U.S.C. § 3553(b).

The court finds an insufficient basis for such a determination in this case. Although the government's evidence shows that defendants' operation was somewhat extensive, the evidence as to the details of the operation is too sketchy and vague to determine *how* extensive the operation was. In addition, the government has offered no evidence of the typical bookmaking operation charged under § 1955 or in any other gambling case. Therefore, this court lacks a sufficient foundation to evaluate how the breadth of this gambling operation compares to that of other such operations. Furthermore, the court finds it significant that the Sentencing Commission's 1988 annual report and its September 1989 update show no court has departed upward in any of the twenty gambling cases occurring from the time the Guidelines went into effect through July 31, 1989. Surely some of those cases involved operations at least comparable to the one charged here.[5] For all of these reasons, the government has failed to persuade the court that departure based on the breadth of defendants' operation is warranted in this case.

### B. Defendants' Alleged Association with Organized Crime

The government claims that several of its witnesses attest to the defendants' connection to organized crime. The government argues that upward departure is appropriate based on that connection.

---

**4.** *United States v. Crawford,* 883 F.2d 963, 964–65 (11th Cir.1989), rebuts defendants' argument relating to the structure of the Guidelines. In *Crawford,* defendant pled guilty to simple possession of cocaine, and the district court departed upward based on the large amount of cocaine the defendant possessed. The district court noted that quantity is not taken into consideration by the Guidelines in drug possession offenses. The appellate court affirmed, rejecting defendant's argument that if the Commis-

sion had intended upward adjustments for quantity in possession offenses it would have expressly provided for such adjustments as it did for distribution offenses.

**5.** Moreover, even if those cases actually involved operations much smaller in scope than the operation in the instant case, the government has failed to provide the court with any evidence to support such a conclusion.

The court, however, fails to see how defendants' ties to organized crime, even if true, justify upward departure in this case. Defendants' connections to organized crime are allegedly related to their illegal gambling operation. The government concedes that there is no evidence at all in this case of any violence, extortion, or other criminality normally associated with mob activities. Since defendants have already been charged with and have pled guilty to conducting illegal gambling activities, their gambling connection to organized crime has already been taken into consideration by the Guidelines. Therefore, any upward departure based on defendants' alleged mob connections would amount to punishing defendants merely for their alleged associations with certain individuals. The court finds no basis for such a departure under the Guidelines.

Moreover, the government's evidence of defendants' connection to organized crime is hearsay upon hearsay upon hearsay from questionable sources. The witnesses' statements allegedly connecting defendants to organized crime are so vague and general that they do not, in the view of this court, constitute sufficiently reliable or credible evidence to support the conclusion that defendants were connected to organized crime. Therefore, the court rejects defendants' alleged organized crime associations as a basis for upward departure.

### C. Defendants' Prior Similar Criminal Conduct

The government acknowledges that since the Guidelines do consider prior criminal conduct in assessing the criminal history category of each defendant, prior criminal conduct normally does not constitute a factor "not adequately taken into consideration by ... the Guidelines" which warrants departure. Nevertheless, the government argues that the Guidelines do not take into account the *similarity* of defendants' prior criminal acts. The government claims that since the defendants in this case are life-long bookmakers who have repeatedly broken the same federal laws prohibiting gambling, they should receive enhanced punishments.

As the defendants have pointed out, the government's argument on this point is based largely on proceedings which occurred before Judge Grady in a 1976 case in which an expungement was later entered due to misconduct on the government's part. The government argues that the expungement does not preclude this court from considering the prior charges because the expungement order refers only to probation reports and arrest, fingerprint, and photograph records, not to the transcript of court proceedings which the government wishes to use in this case. However, that interpretation of the expungement order does little justice, if any, to the spirit of Judge Grady's ruling. In fact, the transcript of the proceedings where Judge Grady dismissed the 1976 case clearly indicates that Judge Grady was completely appalled at the government's conduct in the case. Therefore, this court finds that Judge Grady intended to expunge the entire record in the case.

The court notes that even if Judge Grady intended to expunge the entire record, an argument can be made that pursuant to § 4A1.2(j) of the Guidelines this court may still consider the expunged proceedings in sentencing defendants. Section 4A1.2(j) authorizes the court to consider expunged convictions in determining the adequacy of defendants' criminal history category. This court, however, sees a distinct difference between expunged convictions and the expunged proceedings before Judge Grady. Whatever may be the reasoning behind expunging a particular criminal conviction, it is obvious that Judge Grady's justification for expunging the 1976 proceedings was that it would be unfair to hold those charges against a defendant in any way where there turned out to be no legally justifiable basis for maintaining the charges. Therefore, in order not to undermine Judge Grady's expungement order, this court will not consider the 1976 charges against defendants or the proceedings related thereto.

Absent those charges, Spadavecchio has no prior criminal record, so there is no foundation for arguing that the court

should depart upward due to any prior similar criminal conduct on Spadavecchio's part. While Cortina and Angelini both have been the subject of other past criminal charges relating to gambling, the court finds that those charges, by themselves, do not constitute sufficiently egregious circumstances to justify an upward departure. Instead, the court finds that the similarity of Angelini's and Cortina's prior criminal conduct is more properly taken into account in selecting the appropriate sentence for these defendants from within the Guideline range applicable to each of them.

### D. Duration of the Operation

█ The facts clearly establish, and indeed defendants have admitted at the sentencing hearing and in their plea agreements, that their bookmaking business began no later than 1983 and lasted until their arrest in June 1989. The government argues that upward departure is warranted on the basis that the operation lasted at least six years because the Guidelines do not take into account that type of extended criminal activity. The court agrees with the government that in some circumstances upward departure may be appropriate on the grounds that a defendant has engaged in criminal activity for an extended period. For example, in *United States v. Burns*, 893 F.2d 1343 (D.C.Cir.1990), the court held that the district court was justified in departing upward on the basis that defendant's criminal activities were "prolonged and repetitive in nature." *Id.* at 1346. Noting that defendant had committed fifty-three separate acts of theft over a six-year period, the court stated:

> The trial judge could have reasonably concluded that the duration of the execution, then, warranted enhancement. We note that a defendant who persists in his criminal activity over a period of years may deserve a harsher sentence than a defendant whose crime was limited in duration because the former has arguably had more opportunities to renounce his illegal schemes. Accordingly, the trial court's finding that the duration of

[defendant's] crime justified upward departure ... was not unreasonable. *Id.*

The court finds that in the instant case, however, departure is not warranted based on the duration of defendants' criminal activity. The government's other arguments for upward departure have already been rejected, and this court is reluctant to depart upward based solely on the duration of the crime. Even in *Burns*, the trial court did not depart upward based solely on the duration of the defendant's criminal conduct; the court expounded two other strong reasons for its enhancement of the defendant's sentence. *Id.* at 1345. In addition, despite extensive monitoring of defendants' operation, the government did not unearth any criminality on the part of defendants except that with which they are charged in this case—illegal bookmaking and tax fraud. Finally, the court gives some weight to the fact that the defendants have pled guilty. By doing so, defendants have readily admitted their crimes and have saved the government the large amount of expense and time which a lengthy trial of this case would have consumed. Therefore, rather than depart upward based on the length of defendants' operation, this court will consider the duration of the criminal activity in selecting the appropriate sentence for defendants from within the Guideline range applicable to each of them.

### IV. SENTENCE

As the foregoing discussion indicates, the government has raised several aggravating circumstances of defendants' crimes. Specifically, defendants' operation lasted over six years, and at no time during that period did defendants renounce their criminal activity despite having ample opportunity to do so. Defendants' involvement in bookmaking is particularly unsettling in the cases of Angelini and Cortina, since they had previously been found guilty of gambling-related crimes in the past. Defendants' operation also took in large amounts of money and involved numerous employees and patrons. Although the court has rejected these factors as a basis

for upward departure, the court finds that these circumstances clearly indicate that a sentence at the upper end of each defendant's Guideline range is appropriate in this case.

Accordingly, the court imposes the following terms of imprisonment: Cortina, 21 months; Angelini, 21 months; Spadavecchio, 18 months. The court further orders that each defendant's term of incarceration shall be followed by a 3-year period of supervised release. As a condition of his supervised release, each defendant shall refrain from engaging in gambling activities in connection with sporting events any place where it is unlawful to do so. Specifically, defendants shall not participate in any way in bookmaking, placing or accepting wagers, or paying or collecting gambling monies.

Each defendant's conduct also subjects him to a fine. Section 5E1.2 of the Guidelines provides that the court must impose a fine unless the defendant is unable to pay and it is unlikely that he will become unable to pay, or unless imposition of a fine would unduly burden defendant's dependents. In this case, after examining the compendiums of defendants' financial circumstances contained in the presentence investigation reports of the defendants' respective probation officers, the court finds that each defendant has the ability to pay a substantial fine and that payment of such a fine would not unduly burden the defendants' families. Moreover, the court finds that in light of the considerable income each defendant derived from his participation in the gambling operation, payment of a substantial fine is clearly appropriate in this case.

Under § 5E1.2 of the Guidelines, the fine can be as high as "three times the gross pecuniary gain to all participants in the offense."[6] In this case, the evidence shows that defendants profited considerably from their bookmaking operation. Wiretap evidence contains conversations of defendants and their employees accepting extremely large amounts of wagers. For example, evidence shows that one of defendants' four offices took in close to $200,000 in football bets over the Thanksgiving weekend in 1984. Other intercepted communications show that defendants' employees routinely accepted wagers for tens of thousands of dollars on single days, and that defendants personally accepted thousands of dollars in cash and cashier's checks from losing bettors on a regular basis.

Defendants argue that their actual net income was not very great. This argument loses its credibility when viewed in light of the fact that defendants had numerous salaried employees in several offices. One of those employees—Leonard Zullo—admits that by 1989 he was making almost $34,000 per year. It would be wholly implausible to believe that defendants were profiting less than they were paying their employees—for six years. Moreover, the court finds that defendants' net income is irrelevant. Section 5E1.2 speaks to *gross* pecuniary gain. Thus, even if defendants had huge losses which offset their substantial gains, they are still subject to a fine based on the amount of their gross gains. As discussed above, the evidence clearly shows that defendants received large gains.

Therefore, the court imposes the following fines on defendants: Cortina, $75,000; Angelini, $75,000; Spadavecchio, $50,000. Under § 5E1.2 of the Guidelines, each defendant must also pay for the cost of his imprisonment, $1,210.05 per month, and the cost of his supervised release, $1,100 per year. Finally, pursuant to § 5E1.3 of the Guidelines, each defendant must pay a special assessment of $25 for each misdemeanor count and $50 for each felony count on which he is convicted. Since defendants have pled guilty to one misdemeanor count and one felony count, each defendant is ordered to pay an additional $75.

IT IS SO ORDERED.

---

**6.** Thus, even if defendants received gross pecuniary gains of only $25,000—a meager figure considering the scope and duration of their operation—they could be fined as much as $75,000.