UNITED STATES of America

v.

**Frank J. SCHWEIHS and Anthony F. Daddino.**

**No. 88 CR 763.**

United States District Court, N.D. Illinois, E.D.

Feb. 12, 1990.

Allan A. Ackerman, Sharon G. Kramer, John L. Sullivan, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

Frank Schweihs was charged on October 12, 1988 in a fifteen-count indictment: in count 1, conspiracy to commit extortion in violation of 18 U.S.C. § 1951(a) and (b)(2); in counts 2 through 14, attempted extortion in violation of 18 U.S.C. § 1951(a) and (b)(2); and in count 15, solicitation to commit a crime of violence in violation of 18 U.S.C. § 373(a). On September 29, 1989, the jury returned a verdict of guilty on counts 1, 4 through 13, and 15, and a verdict of not guilty on counts 2, 3, and 14. Mr. Schweihs is now before the court for sentencing. Mr. Schweihs will be sentenced under the Sentencing Guidelines for counts 1 and 6 through 15, and under pre-Guidelines law for counts 4 and 5. Three issues must be resolved under the Guidelines. First, the government seeks to increase Mr. Schweihs's Criminal History Category from I to VI. Second, the government moves for an upward departure in assessing the seriousness of the offenses committed by Mr. Schweihs by having the court consider the role of organized crime in the offenses. Last, Mr. Schweihs objects to the probation officer's addition of 4 levels to his offense due to his alleged role as a leader of a criminal activity.

*Criminal History Category*

■ The probation officer found Mr. Schweihs's criminal history category to be I. He arrived at this category because Mr. Schweihs has no prior criminal sentences under § 4A1.1, and therefore, no criminal history points. The government argues that Mr. Schweihs should have a criminal history category VI, and points to § 4A1.3 in the Guidelines as authority for its position. This section of the Guidelines states:

If reliable information indicates that the criminal history category does not ade-

Thomas Knight, Strike Force Atty., Chicago, Ill., for plaintiff.

quately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guidelines range....

. . . . .

A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.

The government cites several incidents involving Mr. Schweihs to support its argument for enhancement under § 4A1.3. The court considers only one of those incidents to be based on sufficiently "reliable information [that] indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct...."

Mr. Schweihs was convicted in Florida of willful possession of an electronics device, knowing that the device was primarily useful for surreptitious interception of wire communications, under 18 U.S.C. § 2512(1)(b). The following facts are taken from the Fifth Circuit opinion in that case, *United States v. Schweihs*, 569 F.2d 965 (5th Cir.1978). Mr. Schweihs was apprehended at around 11:00 p.m. on May 4, 1975 when the owners of a car repair shop conducted a security check of their establishment. He was found hiding underneath a car, which was a couple of feet from a telephone pole and a junction box. The telephone pole was at the corner of a chain-link fence that surrounded a Wells Fargo facility. Ten feet away from Mr. Schweihs was a homemade "operational amplifier," alligator clips, a miniature Triplett volt-ohmmeter, and a Western Electric lug wrench. Furthermore: "The telephone company's underground terminal box was open, and the miniature Triplett volt-ohmmeter was attached to the exposed telephone wires. Next to these objects the police discovered a travel kit and a flashlight. A search under the front-end suspension of the Pinto produced a police 'scanner,' which

was set on the local police frequency, and a pair of gloves." *U.S. v. Schweihs*, 569 F.2d at 967. Mr. Schweihs's operational amplifier was also equipped with an input capacitor, a device that stores electrical energy in such a way that, when the amplifier is hooked into a line of current, the capacitor holds the current drawn from the line constant and thereby keeps the voltage output of the supply constant. *Id.* at 970.

The government's theory at trial was that Mr. Schweihs had been in the process of burglarizing the Wells Fargo facility, and the operational amplifier was to detect whether the facility's silent burglar alarm was being set off. Using an input capacitor with the amplifier would have enabled Mr. Schweihs to "listen" to the burglar alarm without being detected. That is, the amplifier would have monitored changes in electrical impulses, (an increase indicating that the silent alarm had gone off), while the input capacitor would have maintained a constant level of current, hiding the fact that the line was being tapped. *Id.* at 970. Mr. Schweihs was convicted and sentenced under 18 U.S.C. § 2512(1)(b). The Fifth Circuit reversed the conviction. The reversal was based on statutory construction; The Court of Appeals held that Mr. Schweihs's amplifier was not designed *primarily* for surreptitious interception of wire communications, as is required under § 2512(1)(b): "any person who willfully ... (b) ... possesses ... any electronic ... device, knowing ... that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire ... communications...." Although it reversed on the legal issue, the court also made clear what facts had been shown at trial:

Although the homemade amplifier may well have been built for the purpose of surreptitious interception of wire communications, *and although it was being so employed when discovered by police*, its design characteristics do not render it primarily useful for that purpose. (emphasis added).

*United States v. Schweihs*, 569 F.2d at 971.

Ordinarily, a conviction that has been reversed would not be counted in comput-

ing a defendant's criminal history category under § 4A1.1 since it would be considered an "expunged conviction" under § 4A1.2(j). However, § 4A1.2(j) itself provides that such convictions can be considered under § 4A1.3 (Adequacy of Criminal History Category). As has already been noted, § 4A1.3 permits the court to depart from the applicable range when "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." The court considers the Fifth Circuit's opinion in *U.S. v. Schweihs* to be precisely such "reliable information." Mr. Schweihs objects to characterizing the *Schweihs* opinion as reliable, claiming that the court merely recited the government's theory, *Id.* at 967, and in no way endorsed that theory. This reading of the case is simply wrong. While the court did characterize certain portions of its opinion as comprising a recital of the government's theory, it also recited many facts as having been established at trial. Furthermore, the court stated unequivocally at the end of its opinion that Mr. Schweihs's homemade amplifier was in fact being used for surreptitious interception of wire communications. *Id.* at 971. That Mr. Schweihs's conviction was reversed does not undermine the reliability of the facts as found by the Fifth Circuit. The reversal was based purely on the legal question of whether Mr. Schweihs's amplifier was "primarily" for surreptitious interception.

The court will therefore consider Mr. Schweihs's prior conviction as reliable evidence that category I does not adequately reflect the seriousness of Mr. Schweihs's past criminal conduct. If Mr. Schweihs's 1976 conviction had not been reversed, it would have added three points to his criminal history score. Some distinction should be made, however, between a conviction and a conviction reversed on appeal, regardless of the reliability of the underlying facts. Accordingly, the court will add two, not three, points to Mr. Schweihs's criminal history. The court is aware that, by itself, a two point addition has the same practical consequence as a three point addition—that is, both put Mr. Schweihs into category II.

As noted, however, the court believes it must distinguish between convictions and reversed (though factually reliable) convictions. The court also recognizes that, depending on what happens on appeal, some of this court's findings on discrete issues may be upheld and some may be reversed. It is therefore possible that the difference between two and three criminal history points may have real consequences somewhere down the line.

The Guidelines (§ 4A1.3) and *U.S. v. Miller*, 874 F.2d 466, 470–71 (7th Cir.1989), direct district courts to look at the appropriate higher criminal history categories when contemplating a sentence enhancement. Adding two points to Mr. Schweihs's criminal history places him in category II, which means he shares the same criminal history as a defendant who served time on one felony conviction (§ 4A1.1(a)), or who committed the present offense while under sentence for some other offense (§ 4A1.1(d)). The court believes that the acts Mr. Schweihs committed in 1975 are commensurate with these, and that Mr. Schweihs's criminal history is appropriately enhanced under the Guidelines to category II.

The court rejects the government's argument that Mr. Schweihs's criminal history be enhanced to category VI. The court has considered the evidence supporting such an enhancement and finds it to be more properly considered as a characteristic of the offense at § 2B3.2 than at § 4A1.3. The government cites pre-Guidelines cases supporting its position that it is appropriate to consider a defendant's ties to organized crime. This may be so, but it does not resolve the question of where in the analysis such consideration is appropriate. In any highly structured scheme, such as the Sentencing Guidelines, it is important that a given fact be treated in its proper pigeonhole. The clear focus of Chapter 4 is on prior convictions and sentences, that is, events prior to which there has been some kind of court adjudication. For example, § 4A1.3 specifically forbids considering prior arrests: "a prior arrest record itself shall not be considered." See also, *U.S. v.*

*Miller,* 874 F.2d 466, 468 (7th Cir.1989). And while it is true that a conviction is not required in order to upwardly depart, *Miller* at 469, most of the relevant sections specifically use the word "sentence," as in §§ 4A1.1, 4A1.2, and 4A1.3(a), (b), and (d), or contemplate some sort of adjudication, as in § 4A1.3(c).

The only exception is § 4A1.3(e), which allows the court to consider "prior similar adult criminal conduct not resulting in a criminal conviction." Even this section, of course, must be supported by more than a prior arrest record. The question then becomes, where along the continuum between a prior arrest record and a prior sentence does a court place the kind of conduct contemplated by § 4A1.3(e)? Put another way, what do the Guidelines mean by "criminal conduct not resulting in a conviction"? The government argues that Mr. Schweihs's underworld ties, established in the tapes and through certain witnesses, is what § 4A1.3(e) contemplates. The court disagrees. The phrase "criminal conduct not resulting in a conviction" must be interpreted in light of the rest of Chapter 4 and especially in light of the need for "reliable information" regarding past criminal conduct, as mandated by § 4A1.3. This court interprets "reliable information" as requiring a preponderance standard. This standard cannot be met within the structure of Chapter 4—with its focus on sentences and convictions—unless there has been a specific act leading to some kind of criminal or quasicriminal process well beyond an arrest.

■ It is not necessary to decide in this case how far beyond an arrest is far enough. The government has not been able to point to specific acts by Mr. Schweihs leading to any kind of adjudication, other than the 1976 conviction. The kind of evidence the government has is more appropriate to show how Mr. Schweihs used mob connections ("we'll take care of him just like we did the Spilotro brothers") than to show actual crimes committed. The court will discuss this evidence in the next section. As persuasive as Mr. Schweihs's ties to organized crime may be—and that evidence is persuasive—this court interprets § 4A1.3(e) as requiring specific acts leading to some kind of adjudication. Only then will the court have considered "reliable information" to determine a defendant's criminal history. The court finds that the government's evidence in support of enhancing Mr. Schweihs's criminal history, other than the acts leading to his 1976 conviction, is not reliable under § 4A1.3, and therefore will not increase him beyond category II.

### The Role of Organized Crime

■ The second issue that the court must resolve is the government's motion for an upward departure in the level of the offense conduct, § 2B3.2 Extortion by Force or Threat of Injury or Serious Damage. The government argues that because Mr. Schweihs committed his crimes on behalf of, and through use of, an organized crime organization, this should enhance his base level offense by 6–8 levels. Authority for an upward departure can be found in 18 U.S.C. § 3553(b), where the statute directs the court to impose a sentence within the Guidelines "unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. . . ."

The court agrees with the government that some upward departure is appropriate. While it remains a mystery as to why the Guidelines do not consider the presence of organized crime as a factor to be considered at sentencing, there is ample and widespread comment in the caselaw on the dangers such enterprises pose for society. See, *e.g., Russello v. United States,* 464 U.S. 16, 27–28, 104 S.Ct. 296, 302–303, 78 L.Ed.2d 17 (1983); *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313, 1317 (7th Cir.1981); *United States v. Angelilli,* 660 F.2d 23, 31–33 (2nd Cir.1981); *United States v. Elliott,* 571 F.2d 880, 889, 899 (5th Cir.1978); *Franz v. United States,* 707 F.2d 582, 604 (D.C.Cir.1983); *United States v. Mazzei,* 700 F.2d 85, 90 (2d Cir. 1983); *United States v. Sutton,* 642 F.2d 1001, 1004–5 (6th Cir.1980); *United States v. Anderson,* 626 F.2d 1358, 1368 (8th Cir.

1980); *United States v. Parness*, 503 F.2d 430, 439 (2d Cir.1974). Organized crime is extraordinarily difficult to detect and prosecute, and, since organized crime structures are in essence business ventures, they are able to manufacture a high volume of their product—crime. Furthermore, because of its business-like nature, and the cost of jail time to that business, such an organization is more likely to be deterred by the prospect of prison than, say, a person who commits a crime of passion.

The evidence linking Mr. Schweihs to organized crime—and his use of that association—was manifest throughout the trial. It appears throughout the tapes, it was the subject of countless sidebars, and it was explicitly dealt with in four motions in limine. *See, e.g.:* August 30, 1989 Memorandum Opinion and Order granting the government's 404(b) motion to admit evidence of past extortions through use of mob connections (e.g., Mr. Schweihs's threat to deal with Nicholas LaPapa "just like we did the Spilotro brothers"); September 11, 1989 Minute Order reserving ruling on Mr. Daddino's motion to exclude evidence of a newspaper article on the death of Lou Eboli; September 12, 1989 Minute Order denying defendants' motion to exclude the newspaper article on Lou Eboli; and the September 25, 1989 Memorandum Opinion and Order denying defendants' 403 motion to bar Mr. Wemette from explaining mob references on the tapes. The evidence linking Mr. Schweihs to the mob is reliable and the court considers it to be clear, at least by a preponderance of the evidence, that Mr. Schweihs used that association to carry out the crimes of which he has been convicted.

Mr. Schweihs argues that considering organized crime links at sentencing is merely a way of circumventing a RICO charge that the government could not indict and prove. This argument is unpersuasive. That Mr. Schweihs was not on trial for being part of organized crime, as he would have been if he had been indicted under RICO, does not diminish the role of organized crime in this particular Hobbs Act conviction. That role was clearly shown at trial, and is an aggravating factor to be considered under 18 U.S.C. § 3553(b).

The court now must decide how many levels to add to the base offense level, which is 18 for § 2B3.2. One of the specific offense characteristics that is taken into account under this section is use of a firearm in the extortion. Although the analogy is rough, the court considers the use of mob ties as a kind of weapon wielded by the extortionist against his victim. (The use of this analogy is not original with this court. In *Carbo v. United States*, 314 F.2d 718, 741 (9th Cir.1963), the court referred to a mob enforcer in a Hobbs Act prosecution as follows: "Here Sica stood in the position of a dangerous weapon to be used to strike fear into the hearts of Leonard and Nesseth.") To the extent that this analogy is persuasive, then, departure can still be accomplished within the framework of the Guidelines. Mr. Schweihs used his underworld affiliations as a weapon to enhance his ability to succeed in his extortionate conduct. His sentence should be similarly enhanced. The Guidelines stipulate a 5-level increase if a firearm is discharged. § 2B3.2(b)(2)(A). Without in any way denigrating the seriousness of using a firearm in the commission of this or any crime, the court considers use of mob ties in this context to be even worse, because of the wide-spread implications of organized crime to society. The court therefore will increase Mr. Schweihs's base offense level by 7 levels.

*Mr. Schweihs's Role in the Offense*

The last major issue is the probation officer's decision to adjust Mr. Schweihs's offense level upward by 4 levels because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." § 3B1.1. The evidence showing Mr. Schweihs's leadership role is in the conversations where he tells the government informants about his partnership with Lou Eboli and of his assumption of power after Eboli's death. His discussions with Wemette regarding Wemette taking over Touchin's business further support a picture of

Mr. Schweihs as exercising decisionmaking authority. The court considers this evidence to be accurate. The court also agrees with the government that the fact that there are those higher up in the organization than Mr. Schweihs does not preclude a finding that he was an organizer and leader of a criminal activity under § 3B1.1. A 4-level increase is appropriate.

In accordance with this opinion, Mr. Schweihs's Offense Level will therefore be increased from 25 to 32 and his Criminal History Category will be increased from I to II. The Guidelines range is 135 to 168 months. The court will sentence Mr. Schweihs on February 16, 1990 at 12:00 p.m.