UNITED STATES of America, Appellee,

v.

William D. CAMMISANO, Jr.,
Appellant.

No. 89–3041.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1990.

Decided Oct. 24, 1990.

Rehearing Denied Dec. 13, 1990.

Lawrence H. Pelofsky, Overland Park, Kan., for appellant.

Michael J. Dittoe, Kansas City, Mo., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.

HENLEY, Senior Circuit Judge.

William D. Cammisano, Jr. was indicted on two counts of witness tampering, one count of obstruction of justice, and one count of subornation of perjury, in violation of 18 U.S.C. §§ 1503, 1512 and 1622. The jury found him guilty of obstruction of justice, not guilty of one count of witness tampering, and was unable to reach a verdict on the other count of witness tampering and the count of subornation of perjury. On the obstruction of justice conviction, the district court departed upward from the Sentencing Guidelines and sentenced Cammisano to five years imprisonment and also imposed a $25,000.00 fine and a $50.00 special assessment fee. We affirm the conviction, but remand for re-sentencing.

In 1988 the Federal Bureau of Investigation (FBI) in Kansas City, Missouri was conducting an investigation into the murder of Roger Reid. The FBI was also investigating C & C Associates, an alleged money-laundering operation. Cammisano was vice president of C & C Associates and Marvin Carnesecca was president. In January, 1987 Cammisano, who was in his thirties and married, began dating Carnesecca's seventeen-year-old daughter, Carey. In June, 1987 Carey accompanied Cammisano on a trip to Las Vegas where he played in a golf tournament with William Walters. Walters and Cammisano bet money on the tournament. At the end of the first round Cammisano owed Walters $50,000.00. While in Las Vegas Cammisano was able to collect the money from various people, including Reid. Carey and Reid were present when the money was counted out in a hotel room and Carey was present in a restaurant when Cammisano gave Walters a paper bag containing the money which was passed under a table. By the end of the tournament Cammisano owed Walters approximately $119,000.00. After Cammisano returned to Kansas City, Walters telephoned him about ten times to inquire when he would pay the debt. Cammisano did not pay the debt. In August, 1988 Reid was murdered. At trial Carey testified that Reid was a "financial backer" of Cammisano's gambling debt to Walters.

On October 30, 1988 the FBI interviewed Carey concerning any information that she might have regarding Reid's murder. Following the interview, pursuant to court authorized electronic surveillance, the FBI intercepted a telephone call in which Carey told her mother about the interview. Her mother told Carey to tell the agents that she did not know anything. Carey assured her mother that she would because she "did not want [her] ass blown away."

On November 8, 1988 the FBI again interviewed Carey and informed her that she would likely be called to appear before the grand jury investigating the Reid murder. Following the interview, the FBI agents intercepted a telephone call between Carey and Cammisano. Carey told him that the FBI had been questioning her concerning the Las Vegas trip and Reid's connection to it. Cammisano told her that she did not

have to talk to the FBI agents and that if she was subpoenaed to appear as a witness before the grand jury she could claim her fifth amendment right not to incriminate herself. He further explained that if the FBI thought that she had valuable information they would offer her immunity. Carey then asked Cammisano what she should do in that event. The following interchange occurred:

Cammisano: When the time comes ... then you can always tell the truth.

Carey: The real truth.

Cammisano: There's no law, who broke any law?

Carey: Nobody did. Well, like you said.

Cammisano: I wasn't out there with Roger.

Carey: Right.

Cammisano: We don't know what Roger did or what he's into. I went out there and played golf. I gambled, so does everybody else. Maybe I gamble for a living....

Carey: Okay.

\* \* \* \* \* \*

Cammisano: There ain't no money ever exchanged hands. And Roger didn't have anything to do with that.

Carey: Right.

On February 8, 1989 Carey appeared before the grand jury. She testified under a grant of immunity and stated that she did not know of the contents of the bag passed between Cammisano and Walters at the Las Vegas restaurant. However, she later recanted her testimony and testified that the bag contained money.

At trial Carey testified that in the November 8 conversation she believed that Cammisano had told her to lie before the grand jury because she knew that money had exchanged hands. She stated that Cammisano had intimidated her because of the tone of his voice. She further stated that she feared Cammisano because he had physically abused her in the past and related incidents of abuse in the summer and fall of 1987. On cross-examination, Carey stated that she also feared Cammisano because he had a reputation for violence.

She stated she had heard that Cammisano had murdered his brother and that his family was in the "Mafia."

Cammisano testified that he had never abused Carey, but was only concerned for her welfare. During cross-examination, the government asked whether he had a violent temper when it came to women. He responded that he did not think that he did. The government then asked, "Isn't it true that on or about October 25th, 1986, you beat your wife, you beat your children, your wife left you and your children left you and your father and [your brother] Vince Cammisano talked about that, isn't that correct, sir?" Cammisano responded, "I have no knowledge of that." The government then asked, "You specifically deny under oath that you beat your wife, you beat your children, and that your father and Vince Cammisano talked about it? I can refresh your memory should you wish." Cammisano responded, "I do not beat my wife. I have not beat my children any more than anybody else has reprimanded their children."

Over Cammisano's objection, the government introduced a tape recording of an October 25, 1986 telephone conversation between Cammisano's father, William Cammisano, Sr. (WCS) and his brother, Vince Cammisano (VC), in which the brother informed the father that Cammisano's daughter Antoinette had come to live with him. The relevant parts of the conversation follow.

VC: Oh, I don't know, it's been goin' on for about three days.

\* \* \* \* \* \*

VC: Well, they all left.

WCS: They left?

\* \* \* \* \* \*

VC: Well, he just, they just, uh, he just beat her [wife] up in front of the kids and gonna do that and beat the kids, gonna beat the kids up too, or whatever and, and, uh, they finally, they all, uh, they took off and, and, uh, left, Antoinette does not want to go back.

\* \* \* \* \* \*

WCS: Did she, did Antoinette tell ya the reason for anything, why or anything like that? She tell you anything at all?

VC: She told Judy, I don't know what all the details were of what happened. Exactly.

WCS: That why he hit his wife on account of Antoinette or somethin'?

VC: Uh, well, I'd say, like I say, I don't know the, the, you know, the details about it, because Antoinette usually is, is goin' to work when I'm leavin' you know, and then she gets home and she's asleep when I'm home. So I really haven't sat down and talked to Antoinette at all about it.

In rebuttal Antoinette testified that although she left her father's home following an argument, he had not beaten her or her mother.

The district court allowed the tape into evidence as an exception to the hearsay rule either as a present sense impression under Fed.R.Evid. 803(1) or as an excited utterance under 803(2).

■ On appeal Cammisano first argues that the district court erred in admitting the taped conversation between his brother and his father into evidence under Rule 803(1) or (2). Cammisano asserts that either exception requires a showing that the statement was made contemporaneous with the event, and in this case the relevant event was the alleged beating which occurred three days prior to the conversation. He also emphasizes that the conversation was based on multiple hearsay because his brother had not discussed the event with Antoinette. We are inclined to agree that the tape was inadmissible under Rule 803(1) or (2). We, however, need not decide this issue, or address the government's contention that the tape was admissible under other hearsay exceptions. The government introduced the tape to demonstrate Cammisano's violent disposition. However, the jury acquitted him of witness tampering under 18 U.S.C. § 1512, which requires the use of physical force, threats or intimidation. *See United States v. Risken,* 788 F.2d 1361, 1368 (8th Cir.), *cert. denied,* 479 U.S. 923, 107 S.Ct. 329, 93

L.Ed.2d 302 (1986). The jury only convicted Cammisano of obstruction of justice under 18 U.S.C. § 1503, which does not require the use of force, threats or intimidation. *See id.* Thus, any error in the admission of the tape did not prejudice Cammisano and was harmless.

We further find that Cammisano's challenges to two pretrial rulings and his assertions that the district court erred in admitting certain evidence, excluding certain evidence, limiting his cross-examination of Carey, and refusing two proffered jury instruction's concerning Carey's credibility are without merit. In addition, our review of the record convinces us that the district court's conduct did not deprive Cammisano of a fair trial, as he asserts on appeal.

Cammisano also challenges his sentence imposed under the Sentencing Guidelines. Under the Guidelines § 2J1.2, the base offense level for obstruction of justice was 12. Because Cammisano had no criminal history points, his criminal history category was I, resulting in a sentence range of between 10 and 16 months. The presentence report recommended an eight point upward adjustment under Guidelines § 2J1.2(b)(1) based on Carey's trial testimony that Cammisano had threatened her, which increased the range to 33 to 41 months. The report also stated that an upward departure may be appropriate because of Cammisano's involvement with La Cosa Nostra, Kansas City's organized crime organization, and because his criminal history category underestimated his involvement with crime. Cammisano filed objections to the report, asserting, among other things, that the adjustment was inappropriate because the jury had rejected Carey's testimony concerning threats and that the departure was inappropriate because there was no evidence concerning his involvement with La Cosa Nostra.

On December 11, 1989 the district court conducted a sentencing hearing. In support of an upward departure, the government presented the testimony of three FBI agents. Over Cammisano's objection, Special Agent Benjamin Berry testified that based on his review of FBI files Cammisa-

no was a "made member" of La Cosa Nostra. He explained that generally to be a "made member" a person had to murder at the direction of the crime hierarchy. Berry further stated that in a 1978 intercepted telephone conversation between Nick and Carl Civella, Carl related that William Cammisano, Sr. had volunteered his son William to murder a Carl Spero, and that in January, 1984 Spero was murdered in a bomb blast. Berry also testified that in September, 1984 Felix Ferina, a "made member" of La Cosa Nostra, was murdered. On cross-examination, the district court sustained the government's objections to Cammisano's questions concerning the identification of the FBI files Berry had examined, people he had talked to concerning organized crime, and the number of agents investigating organized crime in Kansas City. During cross-examination, Berry admitted Cammisano had not been charged with the Spero or Ferina murders or charged with other organized crime cases, but had only been charged in a "gun case" which had been dismissed.

Special Agent Eugene Thomeczek next testified. Over Cammisano's objection, Thomeczek testified that a confidential informant who was associated with La Cosa Nostra told him that Cammisano was an "under boss" of La Cosa Nostra and as such supervised organized crime activity and shared in the proceeds of illegal activity. He further testified that the informant had learned through sources that Cammisano was involved in the Ferina murder and probably had "pulled the trigger." Thomeczek stated that a Fred Harvey Bonadonna had learned from sources that Cammisano and his father had taken credit for the Spero murder and that Cammisano had placed the bomb in Spero's business.

Special Agent Cullen Scott testified that a confidential informant had learned from sources that Cammisano had a leadership role in the Kansas City organized crime organization.

■ At the conclusion of the agents' testimony and after giving the parties opportunity to comment on the evidence, the court imposed the eight point upward adjustment under Guidelines § 2J1.2(b)(1).[1] The court further found that the preponderance of the evidence demonstrated that Cammisano was a member of organized crime and that was a permissible basis of an upward departure. The court also found that an upward departure was warranted because Cammisano's criminal history score underrepresented his involvement with crime. The court sentenced Cammisano to five years imprisonment and also imposed a $25,000.00 fine and a $50.00 special assessment.

■ The Sentencing Guidelines provide for departures in Chapters 4 and 5. Section 4A1.3 provides that "[i]f reliable information indicates that the criminal history score does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider departing from the otherwise applicable guideline range." Section 5K2.0 provides that "the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating ... circumstance of a kind, or to a degree not adequately taken into account by the Sentencing Commission in formulating the Guidelines.'" (Quoting 18 U.S.C. § 3553(b).) In this case, the district court did not cite either section, but it is clear that the court believed departure was warranted under both sections.

Cammisano argues that any departure based on his membership in organized crime was impermissible because the FBI agents' testimony was unreliable hearsay. The government argues the hearsay testi-

---

**1.** Other than noting that the jury apparently rejected Carey's testimony concerning threats, in his brief Cammisano does not discuss the upward adjustment, and we therefore find that he has abandoned the issue on appeal. Even if properly raised, we likely would find the issue to be without merit. *See United States v. Dawn,* 897 F.2d 1444, 1449–50 (8th Cir.1990) (district court properly adjusted sentence based on use of firearm even though jury acquitted on firearms count because preponderance of evidence standard applies at sentencing), *petition for cert. filed,* No. 90–5432 (U.S. Aug. 10, 1990).

mony was admissible at sentencing and relies on Guidelines § 6A1.3 and *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978) (subsequent history omitted), in which the court permitted consideration of defendants' involvement in organized crime at sentencing. Guidelines § 6A1.3 provides that a sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." The commentary to § 6A1.3 quotes *Fatico,* wherein the court held that neither the Confrontation Clause nor the Due Process Clause was violated by "use in sentencing of out-of-court declarations by an unidentified informant where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means." 579 F.2d at 713 (footnote omitted). The court explained that corroboration was necessary to ensure the "reliability of evidence that is difficult to challenge ... through cross-examination or otherwise...." *Id.* In *Fatico* the court found good cause for nondisclosure and that the information was sufficiently corroborated. In particular, the court noted that the information was corroborated by the testimony of two co-conspirators, by independent observations of police officers, and that the defendants had lengthy records, including convictions for grand larceny, bookmaking, felonious assault, and conspiracy to possess an unlawful still. The court also noted that in the case before the court, defendants had pleaded guilty to conspiracies involving armed truck hijacking and fencing of stolen goods.

This court has recently considered the role of hearsay under the Guidelines. In *United States v. Streeter,* 907 F.2d 781, 792 (8th Cir.1990), this court stated that "[i]f a defendant objects to factual allegations in a presentence report, ... the government must introduce evidence sufficient to convince the Court by a preponderance of the evidence that the fact in question exists." The court explained that "[a]t the evidentiary hearing, the rules of evidence do not apply, but the Confrontation Clause of the Sixth Amendment does." *Id.* In *United States v. Fortier,* 911 F.2d 100, 103 (8th Cir.1990), the court further explained that "hearsay statements admitted against a defendant do violate the Confrontation Clause unless the court finds the declarant is unavailable and that there are indicia of reliability surrounding the truthfulness of the hearsay statements." In *Fortier* the district court in calculating the quantity of cocaine relied on a presentence report in which a probation officer stated that a special agent had told him that an informant had learned from another source that an amount of cocaine had belonged to defendant. In addition, the officer stated that defendant admitted possession of the cocaine in a taped conversation with an informant. This court held that the district court could not rely on the presentence report, which was triple hearsay that "violated Fortier's right to confront witnesses against him, embodied in the Confrontation Clause of the Sixth Amendment." *Id.* at 101.

In this case, we do not find sufficient corroboration of the agents' hearsay testimony concerning Cammisano's involvement in the murders or of his membership in organized crime. At sentencing the government argued that the information was reliable because each confidential informant corroborated the other, and "therefore, it [was] unlikely that this [was] just a mere fantasy of the government or just total speculation on behalf of these confidential sources." However, this is merely "hearsay upon hearsay upon hearsay" and does not "constitute sufficiently reliable or credible evidence to support the conclusion that defendant[ ] w[as] connected to organized crime." *United States v. Cortina,* 733 F.Supp. 1195, 1202 (N.D.Ill. 1990), *appeal filed,* (7th Cir. Feb. 28, 1990). In this case, because of the absence of reliable evidence, the sentence must be vacated and the cause remanded for resentencing.

■ Because of the possibility on remand that the government may be able to provide reliable evidence, we address the government's assertion that membership in

organized crime is a permissible basis of departure under the Guidelines. The government again relies on *Fatico* and directs the court's attention to *United States v. Schweihs*, 733 F.Supp. 1174 (N.D.Ill. 1990), *appeal filed*, (7th Cir. Feb. 22, 1990). In *Schweihs*, the government also relied on preguidelines cases in support of its request for upward departure based on a defendant's ties to organized crime. The court responded to the government's reliance on preguidelines cases by stating: "This may be so, but it does not resolve the question of where in the analysis such consideration is appropriate." *Id.* at 1177. The court explained that "[i]n any highly structured scheme, such as the Sentencing Guidelines, it is important that a given fact be treated in the proper pigeonhole." *Id.*

In *Schweihs*, the court believed that ties to organized crime could not be considered under § 4A1.3, because the focus of that section was on actual crimes committed. *Id.* at 1177–78. In this case, the district court based its departure not on mere membership, but on specific acts. At sentencing the court stated that an upward departure was warranted because Cammisano's criminal history category of I "significantly underrepresents a fact we heard of [—] crimes by the defendant." In the written judgment the court stated that Cammisano's "past criminal record gives good cause to believe that he will continue to participate in future crimes." As previously stated, there was no reliable information connecting Cammisano to the Spero or Ferina murders, and he was never charged for the murders. We note that Guidelines

§ 4A1.3 provides that "a prior arrest record itself shall not be considered." [2]

In *Schweihs* the court, however, believed that association with organized crime could be considered an aggravating factor within 18 U.S.C. § 3553(b) and therefore supported an upward departure under Guidelines § 5K2.0, as long as the defendant "used that association to carry out the crimes of which he has been convicted." 733 F.Supp. at 1179. In *Cortina*, the court also required a connection between a defendant's association to organized crime and the offense of conviction. Without the requisite connection, the court believed "any departure based on defendants' alleged mob connections would amount to punishing defendants merely for their alleged association with certain individuals," for which there was "no basis for ... a departure under the Guidelines." 733 F.Supp. at 1202.

In the instant case, the district court did not consider the question whether Guidelines § 5K2.0 requires a connection between Cammisano's alleged ties to organized crime and the obstruction of justice conviction. Nor did the court "cite to any portion of the Guidelines, discuss the particulars of the Guideline structure, or indicate the particular factors of this case that the Guidelines failed to consider." [3] *United States v. Thomas*, 906 F.2d 323, 328 (7th Cir.1990). In *Thomas*, the trial court departed upward on account of the defendant's membership in a violent street gang.

---

**2.** Even if there had been reliable evidence supporting a departure under § 4A1.3, a remand would be required because the district court failed to explain the extent of the departure. "The Sentencing Reform Act expressly provides that the sentencing court must state 'the specified reason for imposition of a sentence different from that described [in the Guidelines].'" *United States v. Wells*, 878 F.2d 1232, 1233 (9th Cir.1989) (per curiam) (quoting 18 U.S.C. § 3553(c)). "This requirement is not satisfied by a general recitation that the defendant's criminal history category ... underrepresents, in the sentencing court's opinion, the defendant's criminal record...." *Id.* "When considering a departure based on past criminal conduct, the district court must compare the seri-

ousness of the defendant's criminal history with that of offenders in each higher category and then select the category that most closely resembles the defendant's history." *United States v. Thomas*, 914 F.2d 139, 143 (8th Cir.1990).

**3.** We note that several sections of the Guidelines take into account organized criminal activity. *See, e.g.*, Guidelines § 2D1.5 (continuing criminal enterprise), § 2E1.1 (unlawful conduct relating to racketeer influenced and corrupt organizations), § 2E1.2 (interstate or foreign travel or transportation in aid of racketeering enterprise), § 2E1.3 (violent crimes in aid of racketeering activities), and § 4B1.3 (criminal livelihood).

Although the Seventh Circuit believed that "involvement in gang activities might provide ... fruitful grounds for departure," the court refused to decide the issue because of the absence of "a sufficient, particularized statement by the district court of the reasons for and the extent of the departure." *Id.* Likewise, in this case, although perhaps in appropriate circumstances ties to organized crime might provide a basis for upward departure, because of the lack of sufficiently particularized findings and reliable evidence, we do not decide the issue. On remand, assuming that the government can produce reliable evidence of Cammisano's ties to organized crime, the district court must fully articulate its reasons for the departure [4] and the extent of the departure.[5]

■ Cammisano also challenges the imposition of the $25,000.00 fine. He asserts the record does not reflect the basis of the district court's decision. Again, we find that the district court failed to make adequate findings. In *United States v. Walker*, 900 F.2d 1201, 1206 (8th Cir 1990), this court held that "a sentencing court must make specific findings on the record that demonstrate that the factors [set forth in Guidelines § 5E1.2] were considered before a fine may be imposed." The court stated "[w]hen imposing any fine, the district court must consider the defendant's ability to pay, in light of his earning capacity, and the burden the fine places on the defendant." *Id.* at 1206 (footnote omitted). In *Walker*, the court noted that although the government maintained that defendant had

assets to pay the fine, it did not introduce evidence in support of its position. In this case, we note that the presentence report stated that Cammisano had a negative net worth, had not generated income through his sales job, and was living on $15,000.00 to $20,000.00 a year which he borrowed from his family. At sentencing the government stated that Cammisano lived off of "hundreds of thousands of dollars," but introduced no evidence in support. *See Fortier*, 911 F.2d at 104 ("Statements of counsel are not evidence.").

As indicated, in several instances the district court failed to adequately set forth its reasons. We remind the court that

[t]he requirement that the district court articulate, at sentencing, the specific reasons for departure from the recommended sentence is entirely in keeping with the purpose of the Sentencing Reform Act. The Act was intended to do away with the uncertainties and the disparities in sentencing which resulted from earlier systems, where judges had broad discretion in imposing the sentence. To allow a judge to depart from the guidelines with no more explanation than provided here would invite a return to sentencing practices rejected by Congress.

*United States v. Wells*, 878 F.2d 1232, 1233 (9th Cir.1989) (per curiam) (citation omitted).

Accordingly, the conviction is affirmed, but the sentence is vacated and the case is remanded for further proceedings consist-

---

**4.** We note that the district court analysis in *Schweihs* did not cite § 5K2.0, which provides that "[h]arms identified as possible basis for departure from the guidelines should be taken into account only when they are relevant to the offense of conviction, within the limitation set forth in § 1B1.3." Section 1B1.3 provides relevant conduct shall include "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that were otherwise in furtherance of that offense." *See United States v.*

*Kim*, 896 F.2d 678 (2d Cir.1990) (attempt to reconcile §§ 5K2.0 and 1B1.3 in the context of departures based on uncharged misconduct).

**5.** Several courts of appeals have held that under 5K departures, the sentencing court should link the aggravating circumstance to the structure of the Guidelines. *See, e.g., United States v. Pearson*, 911 F.2d 186, 190–91 (9th Cir.1990); *United States v. Ferra*, 900 F.2d 1057, 1062 (7th Cir. 1990); *United States v. Kim*, 896 F.2d at 685. To the extent possible, we also believe district courts should attempt to do so. *See United States v. Pearson*, 911 F.2d at 190 (recognizing some cases may be "ill-suited to departure by analogy").

ent with this opinion.[6]

6. Cammisano also asserts that the district court failed to give him adequate notice of its intention to depart. Because he relies on a draft of a proposed local rule, we do not review the issue. We also believe review is unnecessary in light of the remand. We note that the Supreme Court has granted certiorari in *United States v. Burns,* 893 F.2d 1343 (D.C.Cir.), *cert. granted,* —— U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990), in which the court held that a district court need not give notice of its intention to depart.